Delores ROSS et al., Plaintiffs,

v.

HOUSTON INDEPENDENT SCHOOL DISTRICT, Defendants.

Civ. A. No. 10444.

United States District Court, S. D. Texas, Houston Division.

Dec. 19, 1977.

Weldon Berry, Houston, Tex., for Delores Ross, plaintiffs/cross-defendants.

Joseph Rich, Civ. Rights Div., Dept. of Justice, Washington, D. C., Anna E. Stool, Asst. U. S. Atty., Houston, Tex., for United States of America, plaintiff-intervenor/cross-defendant.

Peter D. Roos, Mexican American Legal Defense & Education Fund, San Francisco, Cal., Abraham Ramirez, Houston, Tex., for Nick Estrada, plaintiff-intervenors/cross-defendants.

William Key Wilde, Kelly Frels, Bracewell & Patterson, Houston, Tex., for Houston Independent School Dist., defendant/cross-defendant.

William A. Harrison, Ross, Griggs & Harrison, Houston, Tex., for Westheimer Independent School Dist., defendant/cross-plaintiff and third party plaintiff.

Grant Cook, Reynolds, Allen & Cook, Houston, Tex., for Spring Branch Independent School Dist., third party defendant.

Lynn Taylor, Asst. Atty. Gen., Austin, Tex., for State of Texas, third party defendant.

Jay Howell and Cheryl H. Chapman, Asst. City Atty., Houston, Tex., for City of Houston, third party defendant.

Robert E. Hall, Houston, Tex., for Houston Teachers Association, intervenor.

FINDINGS OF FACT AND MEMORANDUM OPINION OF DECEMBER 8, 1977

COWAN, District Judge.

*INTRODUCTION*

The findings of fact set forth below are based upon testimony adduced before the Honorable Ben C. Connally in March of

1973, testimony adduced before the Honorable James Noel in November of 1976, a number of pretrial hearings held in this matter commencing on July 18, 1977, and upon a voluminous record adduced from November 16 to December 8, 1977, in the trial on the merits to the Court of HISD's motion for additional permanent injunctive relief against the implementation of WISD.

Although HISD is the moving party, the Fifth Circuit Court of Appeals has determined that the 1973 injunction of Judge Ben C. Connally remains effective until WISD successfully shoulders the burden of presenting a plan of implementation and operation that is established by WISD to be no impairment or impediment to the desegregation of both districts and to be administratively feasible. *Ross v. Houston Independent School District*, 559 F.2d 937 (5th Cir. 1977). WISD has been given an opportunity to introduce virtually all evidence which it wished to present in support of its position and has announced that it has closed its case. HISD has moved to dismiss WISD's claims and for judgment in its favor on its motion for additional permanent injunctive relief pursuant to Rule 41(b), Federal Rules of Civil Procedure.

Based upon the evidence described above, the Court grants both of HISD's motions and enters the following findings of fact and conclusions of law:

## I.

The implementation of Westheimer Independent School District (hereinafter WISD) will materially impede (and the efforts to implement it have already impeded) Houston Independent School District's (hereinafter HISD's) efforts to eliminate all vestiges of the previously existing dual system. Judge Ben C. Connally so found in April of 1973. His exact language was:

In light of the considerations heretofore discussed, I am clearly of the view that the proposed deannexation would seriously and materially impede, hinder and delay the desegregation process in which HISD is presently engaged.

Memorandum and Order of April 4, 1973.

This Court's Tri-Ethnic Committee made similar findings on March 1, 1976, and June 22, 1971 (See HISD Exhibits Nos. 62, 63, 64 and 64–A).

Today the implementation of WISD would be just as harmful as, and possibly more harmful than, contemplated by Judge Connally in April of 1973, and contemplated by the Tri-Ethnic Committee in 1971 and 1976.

The reasons for this finding are:

A. WISD has not proved that it will improve the quality of education for anyone.

WISD's basic position is that the integration efforts of HISD will be aided because WISD will become such an island of educational excellence that black and Mexican-American students will be attracted to WISD. WISD's basic concept has some merit. A longlasting, effective unitary system can probably be achieved only by heroic, very expensive efforts to improve the quality of education for all students; but, the evidence here demonstrates that WISD's chances of achieving its dream are virtually non-existent. WISD, while an effective protest movement, has never matured into a serious, responsible effort to plan and operate a school system.

WISD's plan, here in evidence as Exhibits 14 and 15, would, if implemented, create chaos.

Both the *contents* and the *method* of preparing the WISD plan demonstrate a lack of responsibility and professional competence.

As to *contents*, the heart of the "plan" is the magnet school provision—providing for those magnet schools which would supposedly attract blacks and Mexican-American students. The "magnet" programs contained in WISD's plan were not in fact designed to attract blacks and Mexican-Americans, and it is highly improbable that the programs proposed would attract black

and Mexican-American students. None of the so-called "magnet" programs is original or unique. Each of the so-called "magnet" programs is already in effect in HISD or part of the basic HISD curriculum. Most significantly, WISD's proponents made no studies of the experience in HISD or other communities where the magnet school concept has been employed—for the purpose of determining if the proposed magnet schools would in fact be attractive to blacks and Mexican-American students and parents.

The *method* and *timing* of preparation of WISD's plan are also important. Insofar as this extensive record reveals, no thought or planning whatsoever concerning the details of implementing WISD had been done until receipt of the opinion of the Fifth Circuit Court of Appeals shortly after September 8, 1977. Despite what is now apparent as a complete lack of serious effort to do the hard work of putting a new district in operation, WISD's counsel represented to this Court on the record on July 18, 1977 that WISD was prepared to begin operations and needed only an order of the Court directing the City of Houston to pay tax revenues to WISD. WISD proponents claimed in public that they were prepared to begin running a school district in the fall of 1977 at a time when no detailed planning whatsoever had been done to undertake this enormous responsibility.

The facts concerning the *method* of preparing WISD's plan are: After receipt of the opinion of the Fifth Circuit Court of Appeals on September 8, 1977, the WISD Board established contact with Mrs. Betty Clanton, a housewife with approximately six years of intermittent teaching experience. The last two years of Mrs. Clanton's teaching experience were with HISD and were marked by considerable acrimonious conflict with her superiors resulting in administrative hearings at which Mrs. Clanton's position was rejected by a hearing board which analyzed her complaints. Mrs. Clanton, while a fine, dedicated, intelligent individual, has had absolutely no experience as a school administrator or planner of magnet programs. She is the true author of WISD's plan. Mrs. Clanton's plan was

actually filed with the Court before it had ever been approved by the WISD Board.

WISD on October 20, 1977—just eleven days before the plan was filed with this Court—did employ a qualified consultant, Dr. Donald Johnson. The evidence establishes persuasively, however, that WISD's plan was largely completed before Dr. Donald Johnson was ever employed. Dr. Donald Johnson was not presented as a witness at trial.

The WISD Board also delegated to Mrs. Clanton and her talented, but amateur, assistants the principal task of justifying its "Plan" in Court.

No school district is perfect. HISD is not perfect. However, this Court is not convinced that WISD would or could improve the schools within WISD. The Court is thoroughly convinced that at least initially—and perhaps permanently—the quality of public education within WISD itself would be drastically reduced.

B. The community perception of WISD is that of a "white break-away district." This fact is clearly established by testimony of WISD's own witnesses.

The Supreme Court of the United States in *Brown I, Brown v. Board of Education,* 347 U.S. 483, 493–495, 74 S.Ct. 686, 691, 98 L.Ed. 873 (1954), said:

In *Sweatt v. Painter* [339 U.S. 629, 70 S.Ct. 848, 94 L.Ed. 1114], in finding that a segregated law school for Negroes could not provide them equal educational opportunities, this Court relied in large part on 'those qualities which are incapable of objective measurement but which make for greatness in a law school.' In *McLaurin v. Oklahoma State Regents,* [339 U.S. 637, 70 S.Ct. 851, 94 L.Ed. 1149] the Court in requiring that a Negro admitted to a white graduate school be treated like all other students, again resorted to intangible considerations: '. . . his ability to study, to engage in discussions and exchange views with other students and, in general, to learn his profession.' Such

considerations apply with added force to children in grade and high schools. *To separate them from others of similar age and qualifications solely because of their race generates a feeling of inferiority as to their status in the community that may affect their hearts and minds in a way unlikely ever to be undone.* . . . We conclude that in the field of public education the doctrine of separate but equal has no place. Separate educational facilities are inherently unequal. Therefore, we hold that the plaintiffs and others similarly situated for whom the actions have been brought are, by reason of the segregation complained of, deprived of the equal protection of the laws guaranteed by the Fourteenth Amendment. (emphasis added) (citations omitted)

The WISD movement has conveyed the negative message condemned in *Brown I* loudly and clearly. The negative message is now slightly more muted, but still blares out clearly. (See more detailed discussion in Part II of these Findings.)

C. WISD's plan, by the testimony of its own witnesses, is financially unfair to HISD. This tremendous inequity is marked and extreme. WISD's implementation, in the form presented to this Court, and in the manner proposed by its proponents, will now and in the future unfairly remove financial resources from HISD and concentrate them within WISD. This diversion of finances will interfere with efforts to achieve the promise and challenge of *Brown I and II.*

The inequity in WISD's proposed financial arrangements is illustrated by the straightforward testimony of WISD witness Brandenberger, who testified that the proposed method of implementing the financial arrangements of WISD is unfair to HISD. His analysis was simple. WISD has now within its proposed boundaries approximately 11.4 percent of the tax base of the entire presently existing HISD. In addition, WISD contains the most dynamic growth area in HISD—with 20 percent to 30 percent of the land still undeveloped but now enormously valuable. Within a few years, it is readily foreseeable that WISD's portion of the tax base will be considerably greater than 11.4 percent.

WISD, however, has only four percent of the students of HISD—probably because of smaller family sizes and because of attendance at private schools.

The schools and facilities located within the proposed WISD are relatively modern and were constructed with tax funds derived in the past from the entire HISD. (See HISD Exhibit 58-A.) The proposed WISD now contains some enormously valuable land, acquired in the past by HISD with tax funds from the entire HISD. This land has increased greatly in value and will continue to do so.

The financial advantages of the proposed WISD are intensified by the undisputed fact that educating children from deprived economic and social backgrounds is more expensive than the education of children whose parents are well educated, affluent and have the education, money and leisure to participate actively and effectively in the education of their own children.

Despite the facts set forth above, WISD initially, at least, and in the election it conducted as recently as January of 1977, proposed to assume only 7.046 percent of HISD's bonded indebtedness, an arrangement which Mr. Brandenberger labeled as seriously unfair to HISD. The proposal submitted to voters within the WISD area in January of 1977 assured WISD assumption of only 7.046 percent of the bonded indebtedness. Budget projections by WISD's own witnesses established that WISD, without a tax increase, can now divert between $3 million and $6 million per annum from the education of all children in HISD to the education of the four percent of the pupils located within WISD. It is readily foreseeable that this diversion, in a few years, will be considerably greater and could easily over a ten year period approximate in excess of $216 million. (See HISD Exhibits Nos. 55, 56 and 57.) While it is suggested that WISD may now be willing

to modify the amount of the bonded indebtedness assumed, no legal steps have been taken to modify this patent inequity. WISD's proponents have taken no concrete action to remedy this obvious financial inequity. WISD has not here exhibited the candor of admitting the financial inequity established by its own witness.

This diversion of financing will hamstring efforts to eliminate the effects of past segregation in at least two ways.

*First,* if government entities, including this Court, allow this admitted financial inequity, the negative message condemned by *Brown I* is conveyed loudly, graphically and concretely.

*Second,* final achievement of a unitary system in the Houston area will be expensive. Magnet school programs, majority-to-minority transfers, cluster centers, transportation, improvement in the quality of education so as to attract children and parents of all races, upgrading of the faculty within the entire system are all expensive and will become more so.

Final achievement of the promises and challenges of *Brown I and II* is certain to be difficult, but the difficulties are compounded infinitely if there is a shrinking tax base, inequitable division of the bonded indebtedness, and insufficient funds to furnish the best possible education for all children.

A socio-economic threat looms over this community and over every major city of this nation. The real threat is that the tax base of the inner-city may be destroyed or seriously harmed, resulting in social, economic and educational deterioration of the entire central city. This Court is absolutely convinced that formation of WISD would be a major step towards the creation of a deteriorating central city such as has been observed in many of the metropolitan areas of our nation. All of WISD's own evidence supports this conclusion. One of the most graphic examples is the testimony of WISD witness John Cooper, the head-master of Kinkaid Academy, a man who has devoted his professional life to education. While he is a soft-spoken and conservative gentleman, Mr. Cooper expressed clearly and graphically his fear that formation of WISD would be a major step towards the creation of a deteriorating central city.

D. The present school board and administration of HISD have, since the implementation of the present basic plan in 1975, achieved a degree of momentum which must be sustained and accelerated.

Each year the number of majority-to-minority transfers has increased dramatically. (See HISD Exhibit No. 35). Each year the number of students participating in the magnet school program has increased substantially. The great success of the cluster center programs gives great promise for continued and more accelerated progress. (See HISD Exhibit No. 32.)

The forward progress of HISD was seriously impeded by the failure of bond issues in 1969 and 1972, but in September of 1976 a new bond issue was authorized by the voters of HISD. (See HISD Exhibit No. 61.) Some of the proceeds from this bond sale are being used to construct new schools, all of which will be magnet schools, and a massive facility improvement program is now in progress. (See HISD Exhibit No. 58–A.) WISD's assets are essential to the achievement of this program.

But, there is a factor here that is much more important than the statistically measured progress. The real important fact is that since 1974 the HISD has, for the first time in its history, had a Board of Trustees and an administration truly dedicated to the achievement of a unitary system, with widespread community support for the accomplishment of this purpose, and an on-going forward momentum. This forward momentum started in 1970, but initially faltered. The faltering and hesitancy was overcome in 1974, and true forward momentum was achieved.

HISD's administration is composed of inspired, dedicated, effective, experienced and forceful men and women truly committed to the achievement of the challenges and

promises of *Brown I and II.* This administration has been both dedicated, effective and highly imaginative in the effort to achieve integration. This positive momentum must not be disrupted by a WISD secession. No one can assure this or any other court that an administration employed by WISD would even approach the effectiveness and dedication of the current HISD administration in achieving the goals of *Brown I and II.* The Court finds it highly unlikely that WISD would be successful in employing an administration of equal competence and dedication.

E. The HISD Board of Trustees is integrated and is likely to remain so. In view of the ethnic characteristics of WISD, it is highly unlikely that a WISD Board of Trustees can ever be integrated or will be integrated.

Evidence in this case, and common sense, illustrate graphically that one of the first and most important steps in achieving unitary status in a large metropolitan area such as Houston is to achieve an integrated Board of Trustees.

F. WISD's plan would result in an identifiably white faculty and administration.

HISD has achieved a thoroughly integrated faculty and administration. (See HISD Exhibits 28, 39 and 40.) It is highly probable that most of the experienced teachers now employed in the schools within proposed WISD would resign or refuse new contracts in WISD. The departure rate could result in an 87 percent faculty exodus. (See HISD Exhibits 41, 42 and 43.)

WISD's own witness, Margaret Wisdom, a dedicated and intelligent teacher for 28 years, a leader in her profession, testified forthrightly and persuasively that she would not accept a teaching position in the proposed WISD because the policies contained in its plan would promote an atmosphere of fear and because she would be deprived of valuable contractual rights. WISD in the course of the trial has attempted to modify its plan to remove some

of the objectionable personnel features, but the image projected by the original plan has been conveyed and it will be difficult to remove. WISD still intends to deprive the more experienced teachers in WISD of their contract rights by attempting to employ a new staff of teachers upon one year contracts.

This Court expressly finds that one of the principal objectives and motivations of WISD proponents has been to replace most of the presently employed teachers in the proposed WISD area with newly employed teachers, who would be overwhelmingly white. The WISD movement received great impetus from the cross-over of a large number of black teachers into the schools of the proposed WISD area in 1970 as a result of HISD's implementation of the *Singleton* ratio by order of this Court in its 1970 desegregation decree. WISD leaders have evidenced a belief that, if WISD were permitted to secede, the *Singleton* ratio for WISD faculty and staff would be determined by the ethnic makeup of the faculty and staff hired by WISD, rather than by the ethnic makeup of the present HISD faculty and staff.

WISD's agreement to abide by any order of this Court does not cure this defect. The burden was upon WISD to present a detailed plan that was administratively feasible and that would not impair or impede the desegregation of all the present HISD schools. WISD had an affirmative duty to make crystal clear to its supporters, in preparing its plan, that its secession would not be used as a subterfuge to rid WISD schools of black teachers and to unequivocally commit itself in the plan to maintain the same ethnic balance in its faculty and staff as is maintained by HISD.

Even if WISD desired to employ black teachers and administrators, the image which WISD has projected would seriously interfere with WISD's ability to employ capable black teachers. In response to a poll conducted by HISD after the filing of the WISD plan, most HISD teachers teaching at schools within the proposed WISD stated that because of the repressive nature

of WISD's proposed policies, they would refuse to teach in WISD.

WISD's plan as originally filed in this Court on October 31, 1977, contained provisions that undercover security checks would be made on each proposed new teacher. A detailed background investigation would be made of many aspects of the teacher's life, including a check to insure that the teacher had never been involved in labor union activities. This "undercover" investigation was planned by an organization whose corporate name is "SAI Counter Intelligence."

WISD has projected the strong image of a movement determined to rid itself of most of the teachers now employed in the WISD area, particularly those who are black.

G. Establishment of WISD would create strong financial disincentives to the majority-to-minority transfer and magnet school programs.

If WISD were created, someone would be required to pay WISD tuition for each and every black and Mexican-American student attracted into WISD. WISD in its testimony has suggested (but not committed itself to) a concept that transferees might not be required to pay tuition. In addition to tuition, however, a transferor district loses its state aid attributable to the transferring student. Typically, a magnet school will draw isolated individuals or small groups of individuals from many different schools. (See HISD Exhibits Nos. 31 and 9.) Assuming, therefore, that WISD was able to establish a magnet school which attracted a number of black and Mexican-Americans from HISD, HISD's cost would not be reduced by the exodus of any single black or Mexican-American; however, HISD would be required to sustain a cash loss for each transferring pupil.

Allowance of these financial disincentives would very probably harm the majority-to-minority transfer program and the magnet school program.

H. As indicated above, this Court is convinced that the WISD "movement" is essentially a protest movement, protesting not merely conditions which the protestors perceive in HISD, but protesting societal developments with which HISD can only grapple and not control. If WISD is allowed to exist, other efforts will be made to form similar "break-away districts" no matter how effectively HISD runs its system and no matter what degree of excellence is achieved. (See HISD Exhibits 68 and 69.)

Judge Connally found in 1973 that if WISD were allowed to exist, other efforts would be made to organize separate school districts within HISD and that a very bad precedent would be created. In this connection, he said:

. . . The action taken is because in my judgment it will seriously impede the further efforts of the HISD and of this Court to create a completely unitary system and because I believe it would constitute a very dangerous precedent. . .

Memorandum and Order of April 4, 1973.

Events since 1973 have confirmed Judge Connally's wisdom. (See HISD Exhibits 68 and 39). If WISD were allowed to go into existence, HISD instead of devoting all of its energies to the solution of the enormous problems which confront every urban school district would be continually involved in burdensome, expensive resistance to other "movements."

I. Formation of WISD would deprive HISD of valuable leadership.

As indicated in Paragraph II below, the leaders of WISD have seriously misled many of the movement's followers. These followers have devoted, in good faith, enormous amounts of energy toward the "movement." If the many people within the proposed WISD who have worked so hard on this "movement" could have devoted their time, energy and funds toward an effort to improve the schools within their area, rather than toward an effort to splinter HISD,

substantial, positive results could have been achieved.

An example may help. One of the meritorious, but not original, proposals in the WISD plan is for a pre-school magnet program at a designated elementary school for the purpose of attracting the children of working parents of all races. Poe Elementary School is an old and revered elementary school in a prestigious, long-established, predominantly white neighborhood within HISD and located just north of the Rice University campus. The citizens in the neighborhood of Poe, in an effort to preserve and improve their neighborhood school, established voluntarily and with their own work and funds a pre-school magnet program which has been instrumental in the revitalization of that school and the establishment of a truly integrated atmosphere. Poe's example is just one of the literally hundreds of community, neighborhood efforts which have helped HISD make progress.

This Court is convinced from the evidence that the WISD "movement" has diverted leadership, effort, energy and funds from constructive efforts such as those of the Poe Elementary School patrons and have diverted energy and leadership to the negative, destructive efforts illustrated by the evidence in this case.

The proposed WISD contains many of the most energetic, well-educated, affluent and determined people in the entire world. Many of the residents of the proposed WISD are vitally interested in education and are capable of providing great leadership and dedication. Removal of this group of citizens from HISD will have a detrimental effect upon the achievement of the challenges and promises of *Brown I and II.*

J.  While of minimal relative importance in this Court's analysis, it is significant that the attendance zones surrounding the various schools located within WISD are not coterminous with the boundaries of WISD.

Rearrangement of attendance zones can be an important tool in attempting to achieve a unitary system, particularly as demographic patterns change in our community. Erecting WISD as a new school district merely creates obstacles to the exercise of desirable flexibility in the readjustment of attendance zones.

K.  One of the most serious problems with which HISD must contend is the fact that HISD is surrounded by predominantly white school districts which serve as areas for white flight and bear none of the burdens of eliminating the effects of the previously existing dual system.

This extremely serious problem bedevils many districts. A study of the decisions in this area of the law reveals that HISD has this problem in common with Detroit, Atlanta, Wilmington, St. Louis, Indianapolis and perhaps virtually every urban metropolitan area in our nation.

Several years ago in commenting on this very problem, Judge Clark of the Fifth Circuit Court of Appeals perceptively observed in *Ross v. Eckels,* 434 F.2d 1140, 1150 (5th Cir. 1970) that:

. . . there are areas within the city limits of Houston that are not included within the boundaries of the school district. Is the equal protection clause of the Constitution too impotent to reach the all-white cut-glass set in Spring Branch and the predominantly Negro area in Northeast Houston? Indeed, why would a document as all-pervasive as our Constitution allow the imaginary boundary lines of Pasadena or Galena Park (or even the contiguous all-white Alief or Katy Districts) to thwart racial balance if that balance be constitutionally required?

The evidence currently before the Court inspires one to ask: Indeed, *why*?

The Federal Judiciary, as this Court perceives the trend of authority, has only begun to grapple with the problems of interdistrict relief, where a central city with a large black population is surrounded by predominantly white school districts reluctant to participate voluntarily in efforts to meet the challenge and promise of *Brown I.* In

this connection, see *Milliken v. Bradley,* 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977); *Evans v. Buchanan,* D.C., 379 F.Supp. 1218; D.C., 393 F.Supp. 428; 423 U.S. 963, 96 S.Ct. 381, 46 L.Ed.2d 293; D.C., 416 F.Supp. 328; 555 F.2d 373 (3rd Cir.) involving Wilmington, Delaware Independent School District; *United States v. Board of School Commissioners of the City of Indianapolis,* D.C., 332 F.Supp. 655; 503 F.2d 68 (7 Cir.) and 541 F.2d 1211 (7 Cir.); *United States v. State of Missouri,* 515 F.2d 1365 (8th Cir. 1974) (City of St. Louis); *Newburg Area Council, Inc. v. Board of Education of Louisville, Kentucky,* 489 F.2d 925 (6th Cir. 1973).

The thrust of these efforts, as illustrated in the cases cited just above, is to encourage or require suburban, predominantly white school districts to participate in the burdens of meeting the challenge and promise of *Brown I and II.* In certain instances it has been held that suburban school districts should be eliminated and consolidated with school districts serving the central city. The point here, however, is that it would be retrogressive and ultimately shortsighted for this Court to compound the problem of white, suburban school districts by carving a predominantly white school district out of HISD and then attempting to surmount the massive administrative problems of yoking those racially disparate districts together for desegregation purposes.

## II.

The formation of WISD and its continued existence have been motivated by and are still motivated by a demonstrated discriminatory purpose. This finding is based upon the following evidence:

A. The timing of the formation of WISD's movement is strongly probative of its purpose. (See HISD Exhibit 66–A.)

In 1968 the Supreme Court made clear in the *Green Trilogy, infra,* that affirmative action to carry out the mandate of *Brown,* rather than passive acquiescence, was constitutionally required. In 1969 in *Alexan-*der v. Holmes, 396 U.S. 19, 90 S.Ct. 29, 24 L.Ed.2d 19, the Supreme Court held that the time for all deliberate speed had ended, and effective desegregation must be implemented immediately.

As in many, if not most, areas of our nation the pace of desegregation in Houston in 1969 had been deliberate. Finally, in the summer of 1969 Judge Ben Connally reprimanded HISD and its attorneys for foot-dragging and demanded immediate action. In November of 1969 HISD conducted a school board election which generated considerable controversy about what direction HISD should take in terms of desegregation. A majority was elected to the board which favored taking good faith, affirmative steps to carry out HISD's desegregation duties in accordance with Judge Connally's instructions.

WISD leaders maintain that their movement was solely in response to a decline in the educational quality of HISD schools. However, Joel Coolidge, the present chairman of the permanent WISD board, previously the chairman of the interim WISD board, and one of the founding fathers of WISD testified that he traced the decline in the quality of HISD education to the November, 1969 election of school board members whom he opposed.

The HISD School Board submitted a new desegregation plan to Judge Connally in 1970. In June of 1970 Judge Connally entered a desegregation decree that for the first time enforced the *Singleton* ratio in HISD. This required the crossover of a large number of black teachers into white schools, including the schools of the proposed WISD area. In addition, Judge Connally instituted a student assignment plan involving equidistant zoning. In September of 1970 the Fifth Circuit Court of Appeals affirmed Judge Connally's desegregation decree, modifying the student assignment plan by requiring a geographic capacity zoning plan for the secondary schools and the pairing of 22 elementary schools. *Ross v. Eckels,* 434 F.2d 1140.

The crossover of black teachers into white schools and white teachers into black

schools occurred in the fall of 1970. The student assignment plan was not fully implemented until the fall of 1971. It was in the summer and fall of 1971 that the WISD movement was organized and petitions circulated in accordance with state law in order to form a breakaway school district.

B. The identity and public statements of WISD's founders reveal its initial purpose clearly.

It might be contended that the timing of WISD's birth was a mere coincidence, bearing no relation to the momentous events occurring in the nation; however, a brief analysis of the identity and the publicly stated views of WISD's leaders remove all doubts.

According to the testimony adduced in this Court, the "father" of WISD is Mr. Robert Eckels, who was the Chairman of the Board of Trustees of HISD through 1969. Mr. Eckels' stated public position—widely publicized in the news media—before 1969, and after *Green, infra*, was that he would go to jail before seeing white children bussed to predominantly black schools.

The other principal leader of the WISD movement and currently the Chairman of its Board of Trustees is Mr. Joel Coolidge. For at least fifteen years after *Brown I*, Mr. Coolidge publicly opposed desegregation of public schools.

The Eckels-Coolidge group actively campaigned against school board candidates who ran in 1969 and who were publicly committed to the implementation of *Brown I* and abandonment of the previous "foot-dragging" techniques which had drawn Judge Connally's wrath in the summer of 1969. The Eckels-Coolidge group was defeated and almost immediately commenced efforts to form WISD, publicly stating that their purpose was to form a district like the Spring Branch Independent School District, a suburban district, predominantly white not only in student body but also in its administration and faculty.

Counsel for WISD in the proceedings before Judge Connally in the spring of 1973 was a prominent and respected attorney, widely known in the community as one of the most active and prominent supporters of Governor George Wallace.

C. The consistent failure of WISD leaders to acknowledge the legal obligation of WISD's interim and permanent boards and advise their followers of these obligations in a direct and candid manner reveals a discriminatory purpose.

To be fair to WISD's proponents, it must be acknowledged that we are now able to look at this series of events in the 20–20 light of hindsight; but, nevertheless, in the light of all the evidence, it is now apparent that any lawyer intimately involved in WISD's formation could easily have perceived that the proposed WISD faced severe constitutional obstacles from its inception and that these problems have become more serious with the passage of time.

WISD's leaders have consistently refused to face this reality and have misled the followers of the movement by failing to advise the followers of this clearly perceivable reality.

WISD's printed mailouts to the proponents, in evidence in this case, have consistently misrepresented the effect of the decisions of the Supreme Court and of Judge Connally's injunction in 1973.

In 1968 the Supreme Court of the United States launched the modern era of school desegregation law by deciding those cases commonly described as the *Green Trilogy*—i. e., *Green v. County School Board*, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716; *Raney v. Board of Education*, 391 U.S. 443, 88 S.Ct. 1697, 20 L.Ed.2d 727, and *Monroe v. Board of Commissioners*, 391 U.S. 450, 88 S.Ct. 1700, 20 L.Ed.2d 733 (1968). These cases made it clear that every school board in every area which had previously had a dual system imposed by law had an *affirmative duty* to take vigorous action to eliminate all traces of the previously existing segregated system. Mere announcement of passive willingness to participate in lacklus-

ter compliance with some plan devised by and imposed by the Court was obviously, after 1968, not a compliance with the legal duty of a school board.

The Supreme Court's language was explicit. School boards, including the interim school board of WISD, were in *Brown II:*

. . . clearly charged with the *affirmative* duty to take whatever steps which might be necessary to convert to a unitary system in which racial discrimination would be eliminated *root and branch.*

. . . The burden on a school board today is to come forward with a plan that promises realistically to work and promises realistically to work now . . . it is incumbent upon the school board to establish that its proposed plan promises meaningful and immediate progress toward disestablishing state-imposed segregation. . . .

*Green, supra,* 391 U.S. at 437–39, 88 S.Ct. at 1694.

This clear-cut language has been consistently followed by resolute, forthright, consistent decisions of the Supreme Court of the United States and the Fifth Circuit Court of Appeals. *Keyes v. School District No. 1, Denver, Colorado,* 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973). *Davis v. School Commissioners of Mobile Co.,* 402 U.S. 33, 91 S.Ct. 1289, 28 L.Ed.2d 577 (1971); *Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 91 S.Ct. 1267,. 28 L.Ed.2d 554 (1971); *United States v. Columbus Municipal Separate School District,* 558 F.2d 228 (5th Cir. 1977); *Tasby v. Estes,* 517 F.2d 92 (5th Cir. 1975); *Flax v. Potts,* 464 F.2d 865 (5th Cir. 1972), *cert. denied,* 409 U.S. 1007, 93 S.Ct. 433, 34 L.Ed.2d 299 (1972); *Singleton v. Jackson Municipal Separate School Dist.,* 426 F.2d 1364 (5th Cir. 1970), *rev'd in part sub nom., Carter v. West Feliciana Parish School Board,* 396 U.S. 290, 90 S.Ct. 608, 24 L.Ed.2d 477 (1970).

■ Even though it was implicit in the *Green Trilogy, supra,* that the responsibility for achieving integration rested in the first instance on the school board—not the Court—the Supreme Court in 1971 spelled out even more explicitly the proposition that only if school authorities fail in their initial duty may the courts intervene. *Swann, supra.*

While the Supreme Court's language in *Green, supra,* made the matter crystal clear, the Federal Judiciary commencing with the opinion by Chief Judge Henley of the Eastern District of Arkansas in January of 1970 (*Burleson v. County Board,* 308 F.Supp. 352) and culminating with the opinion of the Supreme Court of the United States in June of 1972 in *Wright v. Council of the City of Emporia,* 407 U.S. 451, 92 S.Ct. 2196, 33 L.Ed.2d 51, was deciding a series of cases relating to white breakaway districts, holding that in a school district in the process of achieving unitary status a predominantly white splinter or island district could be formed only under the most unusual circumstances, and where a showing was made that the formation of the splinter district would not impede the progress of desegregation. See cases cited by the Supreme Court of the United States in this connection in *Wright, supra,* 407 U.S. at 462, 92 S.Ct. 2196.

The opinion of the Fifth Circuit Court of Appeals rendered in this cause on September 8, 1977 broke no new ground but merely stated long existing law.

In light of this precedential background, the WISD proponents here have taken the remarkable position that WISD's "interim" and "permanent" boards could comply with their legal obligations by indicating a passive willingness to follow the orders of this Court. Before August of 1976 there was not even an indication of passive willingness and all of the signals conveyed, at best, extreme lack of enthusiasm for the goal of *Brown I and II.*

If there were any doubt about the law applicable to this situation, it was removed by Judge Connally's forthright injunction in April of 1973, prohibiting the formation of WISD for the reasons stated in that order. WISD never perfected an appeal from Judge Connally's injunction.

In April of 1976, three years after Judge Connally's initial injunction, the proponents of WISD again commenced their efforts to form a district. Despite the terms of Judge Connally's injunction, stating that the district could be formed after three years only if there were a marked change of circumstances, WISD's proponents made no effort to show a change of circumstances.

The enormous expenditure of effort, energy and financial resources that WISD's movement has engendered is precisely traceable to the failure of WISD's initial leaders to perceive and advise their followers of the true legal obligations of the school board since the decision of the *Green Trilogy* in 1968. This Court must conclude that WISD's leaders did not correctly perceive and communicate their legal obligations because they did not wish to do so.

D. The stipulation of August 1976 is not compliance with the WISD Board's legal obligation.

Between April of 1976, when WISD's Board contended that Judge Connally's injunction expired, and August of 1976 the WISD Board, insofar as this evidence reveals, did absolutely nothing to establish a change of circumstances or make detailed plans for the implementation of a district.

In August of 1976 WISD filed in this Court a stipulation which reads in its pertinent part:

> The WISD and interim members of the Board of Trustees of the WISD being interested solely in providing quality education for the students of its district, do hereby STIPULATE AND AGREE: To accept a proper role in the desegregation of the combined geographical area made up of the WISD and the HISD by co-existing with the HISD within the context of all previous orders entered into in this litigation, as well as those to be entered into in the future concerning desegregation and the creation of a unitary school system within the combined area comprised by the WISD and HISD.

This stipulation does not constitute a change of circumstances from Judge Connally's order in April of 1973. The stipulation is meaningless. The authorities establish that WISD, if allowed to exist, would be subject to the desegregation order of this Court. For a party who is obligated to abide by the law to come into court and say he will abide by the law adds nothing.

The language of the stipulation, however, illustrates clearly to this Court, in the light of the testimony of WISD proponents like Mr. Ratliff and Mrs. Wing, that when some of the WISD proponents speak of "quality education" they are not as a group speaking about integrated education.

E. WISD's actions in connection with the preparation of its plan reveal a continuing discriminatory purpose. Several aspects of the WISD plan reveal a continuing discriminatory purpose. They are:

1. The probable effect of the implementation of the plan would be the creation of a predominantly and overwhelming white faculty and administration.

2. WISD made no good faith effort to design magnet programs which would be attractive to black and Mexican-American students or to overcome the financial disincentives described earlier in this opinion.

Judge Connally, in his original opinion of April 4, 1973 (which was later modified) says, ". . . while one may only speculate as to what the purposes of the proponents of WISD might be, the conclusion is inescapable that the purpose was not to improve the quality of education or to create a better school district."

The record before this Court enables this Court to find, and this Court does find that Judge Connally's finding was accurate in 1973, and it is accurate today. (See HISD Exhibits Nos. 44 and 45.)

For the reasons set forth herein, and for the reasons set forth in Judge Ben C. Connally's Memorandum and Order of April 4, 1973, and his Injunction Decree of April 30, 1973 (all of which reasons are incorporated by reference herein and endorsed on the

basis of the evidence adduced at the lengthy hearing herein) this Court entered an order in open court on December 8, 1977 prohibiting the implementation of the Westheimer Independent School District permanently.

This Memorandum Opinion constitutes the Court's findings of fact and conclusions of law.

The Clerk shall file this Memorandum Opinion and send a copy to counsel.