The STATE OF IDAHO et al., Plaintiffs,

Claude L. Oliver, etc., et al.,
Plaintiff-Intervenors,

v.

Rear Admiral Rowland G. FREEMAN, III, Administrator of General Services, Defendant,

National Organization for Women et al., Defendant-Intervenors.

Civ. No. 79–1097.

United States District Court,
D. Idaho.

Feb. 6, 1981.

See also 478 F.Supp. 33.

David H. Leroy, Atty. Gen., State of Idaho, Boise, Idaho, Robert Corbin, Arizona Atty. Gen., Phoenix, Ariz., Mtn. States Legal Foundation, Denver, Colo., David Wm. West, Phoenix, Ariz., John Runft, Boise, Idaho, for plaintiffs.

Michael Farris, Eberle, Farris & Nelson, P. A., Spokane, Wash., for plaintiff-intervenors.

Thomas J. Hart, Washington, D. C., Michael E. Donnelly, Boise, Idaho, for defendant-intervenors.

Elisa B. Vela, Dept. of Justice, Washington, D. C., M. Karl Shurtliff, U. S. Atty., Boise, Idaho, for defendant.

## MEMORANDUM DECISION

CALLISTER, District Judge.

Defendant-Intervenors, National Organization for Women, *et al*, (hereinafter "NOW") have filed a motion to disqualify the Honorable Marion J. Callister from further consideration of the above-encaptioned matter. NOW's motion is styled as an original motion to disqualify brought pursuant to 28 U.S.C. § 455(a), but NOW makes it clear that they wish the Court to consider

the motion as one for reconsideration[1] of the Court's ruling of October 4, 1979, where the Court, in a memorandum decision, denied a similar motion to disqualify made by the defendant. *State of Idaho v. Freeman*, 478 F.Supp. 33 (D.Idaho 1979).

NOW's motion for disqualification, or for reconsideration of the prior ruling, rests on essentially three premises. First, NOW argues that the Court did not use the correct legal standard in determining whether disqualification was required by § 455(a). Second, NOW contends that the Court's attention was not directed to various facts which significantly strengthen the conclusion that a reasonable question as to impartiality is raised. Finally, NOW claims that the excommunication of Sonia Johnson from the Church of Jesus Christ of Latter-day Saints ("Mormons") bears on the issue of whether a reasonable question is raised.

I. *Background of the Case*:

The underlying action is a suit filed by the states of Idaho and Arizona, and legislators from both states, asking for injunctive and declaratory relief, asserting the State's right to rescind a prior ratification, and challenging the constitutionality of Congress' action in extending the ratification period of the Equal Rights Amendment. The suit was filed on May 9, 1979.

In August of 1979, the defendant, through its counsel, the Department of Justice, filed a motion to disqualify Judge Callister under 28 U.S.C. § 455, contending that his impartiality might reasonably be questioned because he then held the position of a Regional Representative in the Church of Jesus Christ of Latter-day Saints. This association was objected to because the First Presidency of the Church of Jesus Christ of Latter-day Saints have publicly stated their opposition to the Equal Rights Amendment. The First Presidency of the Church has also opposed an extension of the ratification deadline.

In a memorandum decision filed October 4, 1979, Judge Callister denied the defendant's motion stating that the

[d]efendant misconceives the relationship between churches and the Government. In our Nation, religion and government operate in separate spheres. The churches of this land, including the Church of Jesus Christ of Latter-day Saints, are involved in teaching things of a religious nature, including the moral obligations of those who believe in God and have the hope of resurrection and of a life hereafter in God's kingdom. . . . However, religious societies have never claimed, nor have they been given, the right to interfere with the relationship between governments and their citizens, though they frequently and regularly encourage their church members to exercise the political rights which they possess to obtain proper representation and consideration in the legislatures of the states and of the Nation.

. . . . .

In this case, it is not claimed, nor could it be, that I have ever publicly expressed any opinion regarding the Equal Rights Amendment, participated in any demonstration for or against the amendment, or in any way involved myself improperly in the political process. The challenge is based solely upon the teachings of the church to which I belong. The teachings of the Church of Jesus Christ of Latter-day Saints include many ideals and principles which would govern in the perfect society. Nevertheless, church leaders have always taught that these principles can only be implemented when a majority of the people wish to implement them.

The church teaches that its members have a responsibility to seek the enactment of laws which are just and which protect the morality and freedom of the citizens of the land. However, the church has never taught either that it has any place influencing judges in their interpretation of the laws, or that a judge's reli-

---

1. "It must also be noted that the instant motion requests that the October 4, 1979, ruling be reconsidered. The motion, accordingly, relates back to that time." Defendant-Intervenors'

Memorandum in Reply to Opposition to the Motion to Disqualify, p. 15 n. 11, *The State of Idaho v. Freeman*, 478 F.Supp. 33 (D.Idaho, 1979).

gious beliefs take precedence over his sworn duty to uphold the Constitution and laws of the United States. There is a crucial distinction between legislative chambers, where everyone (including churches and religious groups) may express their opinions and lobby for the passage or defeat of a particular piece of legislation, and judicial chambers, where any attempt to bring pressure to bear on judges or to lobby for a particular decision would be totally improper. As a judge, I have no obligation to the church to interpret the law in any manner other than that which is required under the Constitution and the oath which I have taken. Under the facts as presented, a reasonable person would not conclude that impartiality of judgment in the instant case is foreclosed by virtue of the position that I hold in the Church of Jesus Christ of Latter-day Saints.

*State of Idaho v. Freeman, supra*, at 36–37.

The defendant did not seek interlocutory appeal or a writ of mandamus from the Court's decision but indicated that it was satisfied with Judge Callister's holding and would reserve the possibility of challenging his decision on final appeal of the case, if one were taken.[2]

By order of this Court, October 10, 1979, NOW was granted status in this case as an

---

**2.** In a Justice Department Memorandum to the File (in *Idaho v. Freeman*) dated November 28, 1979, by Wade H. McCree, Jr., Solicitor General of the United States, McCree wrote:

I have today decided that the interests of the United States in sustaining the Congressional extension of the Equal Rights Amendment ratification period, and in upholding the validity of ratification once given by a state, would not be served by appealing the order of United States District Judge Marion Callister refusing to disqualify himself in the case of *Idaho v. Freeman*. That case presents the questions whether the extension of the ratification period is valid and whether a state may validly rescind its ratification.

The Civil Division has urged me to authorize appeal of Judge Callister's order because Judge Callister is a member of, and a regional representative of, the Church of Jesus Christ of Latter-day Saints, whose leaders have publicly stated their opposition to the Equal Rights Amendment, to the extension of the ratification period, and to precluding a state from withdrawing its ratification. The Administration is fully committed to ratification of the Equal Rights Amendment, and the Department of Justice, which represents the defendant in this case, fully supports the propositions that extension of the ratification period is valid and that a state may not rescind its approval once given.

My decision not to appeal the disqualification order rests in part on my conviction that, by needlessly delaying the resolution of those important questions, such an appeal would disserve the larger interests at stake. Furthermore, as Judge Callister himself recognized in his order, his ultimate ruling on the legal questions presented in this case—and he has given no intimation whatever on what his ruling will be—will not be the final decision. Should his decision be against the government's position, I fully expect that we will appeal that decision.

In addition, I have given weight to Judge Callister's discussion of the separation of church and state in this country and to his statement that "[a]s a judge, I have no obligation to the church to interpret the law in any manner other than that which is required under the Constitution and the oath which I have taken." [Footnote 1. Hence, in my view a decision not to appeal is fully consistent with the Department's decision to file the recusal motion. Whatever appearance of bias may have existed at the time the motion was made has been substantially dispelled by Judge Callister's unequivocal expressions of impartiality. Furthermore, there is a distinct difference between suggesting to a district judge that he may wish to recuse himself and asking a court of appeals to order the district judge to recuse himself.] The entire case for his disqualification rests upon his position as a regional representative of his church in the Boise, Idaho, area and not upon any specific allegation of actual bias. It is my firm opinion, however, that the religious beliefs or affiliations of a federal judge should not be the basis for appeal in a case such as this, especially where that judge has forthrightly expressed his unequivocal ability and intent to decide the case solely according to law.

Moreover, wholly apart from the statutory standard of 28 U.S.C. 455(a), there are several compelling reasons why an appeal at this stage would be unwise. First, it is clear that this order is not appealable as of right under 28 U.S.C. 1291, and I am not persuaded that 28 U.S.C. 1292(b) allows an interlocutory appeal of a judge's order refusing to disqualify himself because of the appearance of partiality. Because this order plainly is not a final one in the sense that it terminates the litigation, appeal would be permissible only if the order "involves a controlling question of law as to which there is substantial ground for difference of opinion and [if] an immediate

*amicus curiae* but denied full party status. After a successful petition to the Ninth Circuit, NOW was granted full party-defendant status by order of this Court dated September 4, 1980. Upon entry into the case, NOW filed this pending motion.

## II. *The Motion*:

 It is well established in the law that an intervening party has the right to litigate fully all issues relating to a pending action. 3B Moore's Federal Practice, ¶ 24.-16[5] (1980); Wright & Miller, *Federal Practice and Procedure*: Civil § 1920 (1972). It is also recognized that decrees entered prior to intervention should not be set aside unless the "prior order or decree would deprive the intervener of substantial rights which he has not been remiss in pressing." 3B Moore's, *supra*, at 24–652. The fact that this Court has already ruled on a motion to disqualify does not foreclose the newly-intervening party from bringing a separate motion for disqualification. A question does remain, however, as to the propriety of NOW's motion to reconsider the Court's ruling of a year ago. From a perusal of the Federal Rules of Civil Procedure and the locally promulgated Rules for the United

States District Court for the District of Idaho, it is evident that a motion to reconsider is not recognized or provided for. The Court will take note that such motions, however, are frequently filed and ruled on by the courts. The propriety of a court entertaining a motion to reconsider is founded in the equity jurisdiction of the courts which can be exercised to prevent error or needless appeal. Thus, it is within the Court's discretion whether such a motion will be entertained.

 In the instant case the Court can follow the defendant-intervenors' suggestion and reconsider its prior ruling or treat the petition as an original motion to disqualify. Since disqualification under section 455 is viewed as self-executing,[3] and since NOW contends that new facts exist justifying disqualification, and because the Court finds no persuasive reason to reconsider its prior ruling, NOW's motion will be treated as an original motion and considered on its own merits.

## III. *The Statutory Scheme for Disqualification*:

The current framework governing judicial disqualification as embodied in sections

appeal from the order may materially advance the ultimate termination of the litigation * * *" (28 U.S.C. 1292(b)). Judge Callister's order does not control the questions on extension and rescission that are before him, and an interlocutory appeal would not advance the termination of the litigation, but would in fact prolong it. [Footnote 2. Because only issues of law are involved here, this case is distinguishable from *Davis v. Board of School Commissioners*, 517 F.2d 1044, 1047 (5th Cir. 1975), cert. denied, 425 U.S. 944, 96 S.Ct. 1685, 48 L.Ed.2d 188 (1976), which allowed an appeal under 28 U.S.C. 1292(b) of an order denying recusal. In a case involving disputed factual questions, a determination on appeal from the final judgment that the trial judge should have disqualified himself would require a remand for new findings before a different trial judge. Hence, in cases like *Davis*, immediate appeal of the recusal issue might expedite the eventual resolution of the legal issues. That is not the situation here.] Furthermore, any appeal under Section 1292(b) would require the permission of both Judge Callister and the United States Court of Appeals for the Ninth Circuit.

Finally, my decision not to authorize appeal is confirmed by my obligation to consider the institutional interests of the United States. The federal government is not an ordinary litigant, and I believe it should not ask a court of appeals to remove a district judge except for the most compelling of reasons. Because resolution of the issues in this case does not require any factual findings, because the case ultimately will be decided on pure issues of law at an appellate level regardless of any determinations by the trial judge, and because of the other factors mentioned above, I do not believe that this case presents such reasons at this time.

In sum, it is my conclusion that the best interests of the United States lie in a speedy resolution of the two legal questions in the district court. I believe that the government has strong arguments on the merits of this case and that it would be a mistake to allow ourselves to be distracted from advancing these arguments at this time to the fullest extent.

**3.** *See infra* pp. 713–714.

144 and 455 of the Judicial Code has received a considerable amount of attention from both the courts and law review commentators. *See, e. g., United States v. Conforte,* 624 F.2d 869 (9th Cir. 1980); *United States v. Sibla,* 624 F.2d 864 (9th Cir. 1980); *Potashnick v. Port City Construction,* 609 F.2d 1101 (5th Cir. 1980); *Blizard v. Frechette,* 601 F.2d 1217 (1st Cir. 1979); *SCA Services, Inc. v. Morgan,* 557 F.2d 110 (7th Cir. 1977); *United States v. Ritter,* 540 F.2d 459 (10th Cir.), *cert. denied, Olson Farms, Inc. v. United States,* 429 U.S. 951, 97 S.Ct. 370, 50 L.Ed.2d 319 (1976); *Matter of Searches Conducted on March 5, 1980,* 497 F.Supp. 1283 (E.D.Wis.1980); 13 Wright, Miller & Cooper, *Federal Practice and Procedure,* § 3549 (1975); Comment, *Disqualification of Federal Judges for Bias or Prejudice,* 46 U.Chi.L.Rev. 236 (1978); Note, *Judicial Disqualification in the Federal Courts: Maintaining an Appearance of Justice Under 28 U.S.C. § 455,* 1978 Law Forum 863; Comment, *Caesar's Wife Revisited—Judicial Disqualification After the 1974 Amendments,* 34 Wash. & Lee L.Rev. 1201 (1977); Comment, *Disqualification of Federal Judges for Bias Under 28 U.S.C. Section 144 and Revised Section 455,* 45 Fordham L.Rev. 139 (1976).

The interrelation between section 144 and section 455 has been subject to various interpretations and has caused some confusion.[4] In particular two questions have yet to be firmly resolved: (1) whether the procedure called for under section 144 applies equally to section 455; and (2) whether the correct standard under section 455 is a bias-in-fact standard or an appearance of bias approach. Since, the courts applying section 455 have taken different approaches to these questions, and a resolution of these questions is important in evaluating NOW's motion to disqualify, it is appropriate to review the development of sections 144 and 455 and the applicable standards under each.

The first federal disqualification statute enacted by Congress in 1792, and the origin of the present statutory scheme, drew from the well-developed English common law two grounds for disqualification. The 1792 statute provided for disqualification where a judge was "concerned in interest" in the cause, or had been "of counsel for either party." 1 Stat. ch. 36, § 11, Act of May 8, 1792. This statute was amended in 1821 to include an additional ground for disqualification—relationship to a party. 3 Stat. ch. 51 at 643.[5] Finally, in 1911 another basis for disqualification was annexed to the existing statute—if the judge was a material witness for a party. At this same time the disqualification statute became section 20 of the Judicial Code of 1911.

The practice which arose around section 20 and its predecessors was essentially a challenge-for-cause statute whereby a judge was required to disqualify himself upon application of a party challenging his right to sit on the case based on one of the enumerated provisions of the section.[6]

---

**4.** *See* 46 U.Chi.L.Rev., *supra,* at 267.

**5.** 3 Stat. ch. 51 at 643 provides:
That in all suits and actions in any district court of the United States, in which it shall appear that the judge of such court is any ways concerned in interest, or has been of counsel for either party, or is so related to, or connected with, either party, as to render it improper for him, in his opinion, to sit on the trial of such suit or action, it shall be the duty of such judge, on application of either party, to cause the fact to be entered on the records of the court; and, also, an order that an authenticated copy thereof, with all the proceedings in such suit or action, shall be forthwith certified to the next circuit court of the district; and if there be no circuit court in such district, to the next circuit court in such state, to the most convenient circuit court in an adjacent state; which circuit court shall, upon such record being filed with the clerk thereof, take cognisance thereof, in the like manner as if such suit or action had been originally commenced in that court, and shall proceed to hear and determine the same accordingly; and the jurisdiction of such circuit court shall extend to all such cases so removed, as were cognisable in the district court from which the same was removed.

**6.** 1 Stat. ch. 36 at 278 provides:
That in all suits and actions in any district court of the United States, in which it shall appear that the judge of such court is, any ways, concerned in interest, or has been of counsel for either party, it shall be the duty

While self-disqualification of a judge was not provided for on the face of the statutes, most courts held that a judge could act *sua sponte* to disqualify himself for one of the grounds provided in section 20. *See, e. g., In re Eatonton Electric Co.*, 120 F. 1010 (S.D.Ga.1903); *but see, Coltrane v. Templeton*, 106 F. 370 (4th Cir. 1901) (however, there is no duty for a judge to disqualify *sua sponte*).

While a challenge under section 20 was initiated by application of one of the parties, it was for the challenged judge to determine whether a ground for disqualification in fact existed. In evaluating the grounds for disqualification, it was clear that the application was not pre-emptive, but that the judge could rely on all applicable facts bearing on the question. For example, in *McGuire v. Blount*, 199 U.S. 142, 26 S.Ct. 1, 50 L.Ed. 125 (1905), the trial judge was challenged on the ground that his wife had acquired an interest in the property which was the subject matter of the litigation. The judge denied his wife's interest and denied the motion to disqualify. The judge stated on the record that his wife had been tendered a quitclaim deed to the property, but that the tender was refused and the deed was never delivered. The United States Supreme Court affirmed the trial court's action, and noted that the judge had placed on file an affidavit of a real estate agent substantiating the facts revealed on the record. By so noting the trial judge's actions, the Supreme Court evidenced their approval of the judge's actions and the general procedure of considering all verifiable facts.

As interpreted by the courts, section 20 was subject to two major criticisms: (1) it contained no mention or mechanism for disqualification for bias or prejudice, either in fact or for the appearance thereof, and (2) the question of disqualification was almost wholly within the discretion of the challenged judge. *See Coltrane v. Templeton, supra*. Congress attempted to deal with these criticisms not by trying to amend section 20 nor change its procedures, but instead Congress addressed them by enacting a separate statute dealing specifically with bias and prejudice and provided it with a distinct set of procedures. The new section, which became section 21 of the Judicial Code of 1911, read as follows:

> Whenever a party to any action or proceeding, civil or criminal, shall make and file an affidavit that the judge before whom the action or proceeding is to be tried or heard has a personal bias or prejudice either against him or in favor of any opposite party to the suit, such judge shall proceed no further therein, but another judge shall be designated . . . to hear such matter. Every such affidavit shall state the facts and the reasons for the belief that such bias or prejudice exists, and shall be filed not less than ten days before the beginning of the term of the court, or good cause shall be shown for the failure to file it within such time. No party shall be entitled in any case to file more than one such affidavit; and no such affidavit shall be filed unless accompanied by a certificate of counsel of record that such affidavit and application are made in good faith. The same proceeding shall be had when the presiding judge shall file with the clerk of the court a certificate that he deems himself unable for any reason to preside with absolute impartiality in the pending suit or action.

Act of March 3, 1911, ch. 231, § 21, 36 Stat. 1090.[7] It bears repeating that section 21 was a separate section from section 20 with

---

of such judge on application of either party, to cause the fact to be entered on the minutes of the court, and also to order an authenticated copy thereof, with all the proceedings in such suit or action, to be forthwith certified to the next circuit court of the district, which circuit court shall, thereupon, take cognizance thereof, in the like manner, as if it had been originally commenced in that court, and

shall proceed to hear and determine the same accordingly.

7. The statute was altered slightly in 1949 when the phrase "in any case" replaced "as to any judge" which resulted in limiting litigants to one recusal motion per case. Act of May 24, 1949, Pub.L.No.80–72, c. 139, § 65, 63 Stat. 99 (codified at 28 U.S.C. § 144 (1970)).

a distinct ground for disqualification and a separate set of procedures for the parties to follow. The new section 21 differed significantly from section 20 in that it provided that whenever a party filed an affidavit of bias or prejudice, the challenged judge "shall proceed no further therein, but another judge shall be designated" to try the case. Thus, it appears that the section was meant to be peremptory [8] in nature.[9]

One concern about adopting such a purely peremptory challenge was the potential for abuse and "judge-shopping." To alleviate these concerns, Congress imposed several important procedural limitations on a section 21 disqualification. First, the allegation of bias or prejudice had to be made by the challenging party in affidavit form with a statement in the affidavit of the facts and reasons for the party's belief that the judge was biased. Second, the affidavit had to be filed in a timely fashion. Third, counsel of record for the challenging party was required to certify that the affidavit was filed in good faith. And finally, in order to prevent unlimited "judge-shopping", a party was permitted to make only one such challenge in any case.

Of these safeguards, it appears that only two directly address the problem of frivolous claims of prejudice. First, the factual basis of bias or prejudice has to be specific and sworn to by affidavit, and second, a certificate of good faith is required of counsel. It appears that Congress intended the perjury statute available against a false affidavit and disciplinary proceedings against the attorney to be sufficient to deter trivial and speculative allegations. Also, the requirement placed on the moving party's attorney of filing a certificate of good faith not only insures the veracity of the facts, it also establishes a method of prescreening the adequacy of the allegations a party claims as a basis for disqualification.

Although from the face of section 21 and from its legislative history it appears that the section was designed to create a fully peremptory approach to disqualification where bias or prejudice is alleged, the United States Supreme Court chose not to give the section such a broad reading. In the leading case of *Berger v. United States*, 255 U.S. 22, 41 S.Ct. 230, 65 L.Ed. 481 (1921), the court dealt with the peremptory nature of section 21. The court held that section 21 was not fully peremptory and that the challenged judge must consider the affidavit filed to determine if it states facts which are legally sufficient to require its disqualification. Under *Berger* a judge is

---

**8.** The purpose of section 21 is clear from Representative Cullop of Indiana's answer to a question of whether the statute allowed judges discretion to determine the sufficiency of affidavits:

> Mr. Cullop: ... no, it provides that the judge shall proceed no further with the case. The filing of the affidavit deprives him of jurisdiction in the case.
> Mr. Cox: ... Suppose the affidavit sets out certain reasons which may exist in the mind of the party making the affidavit; suppose the judge to whom the affidavit is submitted says that it is not a statutory reason? In other words, does it not leave it to the discretion of the judge?
> Mr. Cullop: No; it expressly provides that the judge shall proceed no further.

46 Cong.Rec. 2627 (1911), *quoted in* Note, *Caesar's Wife Revisited—Judicial Disqualification After the 1974 Amendments*, 34 Wash. & Lee L.Rev. 1201, 1216 n.102 (1977).

**9.** Nineteen states have enacted disqualification or change of venue statutes which allow automatic transfer to a new judge. They are Alaska, Arizona, California, Hawaii, Idaho, Illinois, Indiana, Maryland, Minnesota, Missouri, Montana, Nevada, New Mexico, North Dakota, Oregon, South Dakota, Washington, Wisconsin, Wyoming. *Hearings on S.1064 Before the Subcomm. on Improvements In Judicial Machinery of the Senate Comm. on the Judiciary*, 93d Cong., 1st Sess. 61 (1973), quoted in 34 Wash. & Lee L.Rev. 1217 n.109. The courts that have interpreted these statutes have gone different ways. Some have held them to be fully peremptory with automatic disqualification, others have held that such a challenge was peremptory to the extent that the factual allegations in the affidavit could not be contested by the challenged judge. Other courts have pretty well disregarded the intent of the statute and allowed the judge to determine the truth, as well as the sufficiency of the matters asserted in the disqualification affidavit. *See generally, Ross v. Houston Ind. School Dist.*, 457 F.Supp. 18 (S.D.Tex., motion to disqualify denied, June 6, 1977).

to disqualify himself only if the affidavit gives "fair support to the charge of a bent of mind that may prevent or impede impartiality of judgment." *Id.* at 33–34, 41 S.Ct. at 233. A judge's discretion in reviewing the sufficiency of the affidavits is strictly limited however. The Supreme Court in *Berger* held that a judge could not consider the truth of the facts asserted in the affidavits, but· must accept them as true. This procedure under section 21 is thus markedly different from that under section 20 where the judge is not limited or bound by the facts asserted. *See, e. g., McGuire v. Blount, supra.*

Section 21 of the Judicial Code of 1911 was codified in 28 U.S.C. § 25. Later in 1948 it was recodified without significant change; thus all of the procedural requirements of section 21 were carried over into section 144. One of the few changes, however, that was made in the 1948 re-enactment was the addition of the qualifier "sufficient" to the word "affidavit." [10] Thus, Congress reaffirmed the section's semi-peremptory nature.[11]

Section 20 of the Judicial Code of 1911, was recodified in 1948 as 28 U.S.C. § 455. Two changes were made that preserved its distinction from section 144. First, the requirement that disqualification be initiated by a party filing an application was eliminated. This changed section 455 from a challenge-for-cause provision to a self-enforcing disqualification provision where an affirmative duty is placed on the judge to determine whether there is any ground for disqualification in each individual case. *See United States v. Amerine*, 411 F.2d 1130, 1134 (6th Cir. 1969). Second, the adjective "substantial" was inserted as a modifier of the word "interest," in setting forth the grounds for disqualification under the statute. The legislative history gives no clue as to why the word "substantial" was added; nevertheless, this change added to the ambiguity already evident in the standard to be applied.

Section 455, after its change in 1948, read as follows:

§ 455. Interest of justice or judge.

Any justice or judge of the United States shall disqualify himself in any case in which he has a substantial interest, has been of counsel, is or has been a material witness, or is so related to or connected with any party or his attorney as to render it improper, in his opinion, for him to sit on the trial, appeal, or other proceeding therein.

Act of June 25, 1948, ch. 646, § 455, 62 Stat. 908. Because of the judicial gloss that has been put on the statute, plus the inherent ambiguity of the section, it soon became a thorn in the side of the judiciary. For example, the 1948 version of section 455 required a judge to disqualify himself *sua sponte*, but judicial gloss articulated an equally strong requirement or "duty to sit" on an assigned case, i. e., a judge has a duty to sit on a case, even over the objection of a party, if a valid statutory ground for dis-

---

**10.** 28 U.S.C. § 144 reads substantially as follows:

§ 144. Bias or prejudice of judge

Whenever a party to any proceeding in a district court makes and files a timely *and sufficient* affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding.

The affidavit shall state the facts and the reasons for the belief that bias or prejudice exists, and shall be filed not less than ten days before the beginning of the term at which the proceeding is to be heard, or good cause shall be shown for failure to file it within such time. A party may file only one such affidavit in any case. It shall be accompanied by a certificate of counsel of record stating that it is made in good faith. (emphasis added)

June 25, 1948, c. 646, 62 Stat. 898; May 24, 1949, c. 139 § 65, 63 Stat. 99.

**11.** The Supreme Court has explained with regard to statutory construction that the "failure of Congress to alter the Act after it had been judicially construed, and the enactment by Congress of legislation which implicitly recognizes the judicial construction as effective, is persuasive of legislative recognition that the judicial construction is the correct one." *Apex Hosiery Co. v. Leader*, 310 U.S. 469, 488, 60 S.Ct. 982, 989, 84 L.Ed. 1311 (1940) (in reference to Sherman Act).

qualification did not exist. The case which best articulated this "duty to sit" rule was *Edwards v. United States*, 334 F.2d 360 (5th Cir. 1964), *cert. denied*, 379 U.S. 1000, 85 S.Ct. 721, 13 L.Ed.2d 702 (1965), wherein Judge Rives stated:

> After such study as I could give the matter, I reached the conclusion that whether a judge should recuse himself in a particular case depends not so much on his personal preference or individual views as it does on the law, and that, under the law, I have no choice in this case.
>
> It is a judge's duty to refuse to sit where he is disqualified but it is equally his duty to sit when there is no valid reason for recusation.

334 F.2d at 362 n.2.

In a purely theoretical setting, these requirements appear to be compatible and complementary, but in actual application in difficult cases a conflict arose which was often resolved, to the chagrin of the movant, in the judge remaining on the case.

Besides the problem of apparently conflicting duties, the judges were also required to apply a rather ambiguous standard in reviewing an application for disqualification. A judge was to recuse himself in a situation where "he has a *substantial* interest . . . *in his* opinion." The word "substantial" was undefined and subject to myriad interpretations, especially when viewed from the subjective position of the judge applying his own opinion. Applica-

tion of this inherently ambiguous standard put judges in a position where their decisions were frequently questioned, and second-guessed.[12]

The ABA Code of Judicial Ethics provided very little guidance for judges faced with challenges to their impartiality. *See*, *e. g.*, ABA Canons of Judicial Ethics Nos. 4, 13, 29, 33; Miller, *Public Confidence in the Judiciary; Some Notes and Reflections*, 35 Law & Contemp. Prob. 69, (1970). In 1972, however, the American Bar Association appointed a special committee, chaired by former Chief Justice Roger J. Traynor of the California Supreme Court, to revise the Canons of Judicial Ethics. The new Canon tracked the existing grounds for disqualification but established a more detailed standard. The ABA Code of Judicial Conduct, Canon 3 C, provided in relevant part:

3 C. Disqualification

(1) A judge should disqualify himself in a proceeding in which his impartiality might reasonably be questioned, including but not limited to instances where:

(a) he has a personal bias or prejudice concerning a party, or has personal knowledge of disputed evidentiary facts concerning the proceeding;

(b) he served as lawyer in the matter in controversy, or a lawyer with whom he previously practiced law served during such association as a lawyer concerning the matter, or the judge or

---

12. Several of the more notable instances of second guessing are the Senate's rejection of Supreme Court nominee Clement Haynsworth in 1969, *see* Comment, *Disqualification of Judges and Justices in the Federal Courts*, 86 Harv.L.Rev. 736 (1973); and also the noted cases of *Laird v. Tatum*, 408 U.S. 1, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972), and *Mitchell v. Sirica: The Appearance of Justice, Recusal, and the Highly Publicized Trial*, 61 Vir.L.Rev. 236 (1975). Because of the problem raising from these cases a move to amend section 455 began to grow. Senator Hollings of South Carolina stated his reason for his interest in amending section 455:

> Realizing the inequities in requiring a judge to determine whether his interest is sufficient to prevent him from sitting or so small as to require him to sit and being aware of the fact

that any such decision was subject to repeated re-evaluation by others, I introduced, while the Haynsworth hearings were still underway, a bill addressed to this problem. . . . Senator Bayh and I joined, at the time of our debate on the Senate Floor (on the Haynsworth nomination), in an agreement that we would try to sponsor something that would clarify this provision, 28 U.S.C. § 455, about a judge having substantial interest. . . by trying to fix it with more precision in the statute.

Hearings on S.1553 and S.1886 (92d Cong.) and S.1064 (93d Cong.). Before the Subcomm. on Improvements in Judicial Machinery of the Senate Comm. on the Judiciary, 92d Cong., 1st Sess. (1971) and 93d Cong., 1st Sess. (1973) at 24–25.

such lawyer has been a material witness concerning it;

(c) he knows that he, individually or as a fiduciary, or his spouse or minor child residing in his household, has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding;

(d) he or his spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person:

(i) is a party to the proceeding, or an officer, director, or trustee of a party;

(ii) is acting as a lawyer in the proceeding;

(iii) is known by the judge to have an interest that could be substantially affected by the outcome of the proceeding;

(iv) is to the judge's knowledge likely to be a material witness in the proceeding;

. . . .[13]

The most notable feature of the new Canon was an incorporation of an objective "appearance" of justice standard, whereby the challenged judge was required to disqualify himself whenever his impartiality might

reasonably be questioned." *See, generally,* Note, *Disqualification of Judges and Justices in the Federal Courts,* 86 Harv.L.Rev. 736 (1973); Note, *Judicial Disqualification in the Federal Courts: Maintaining an Appearance of Justice Under 28 U.S.C. § 455,* 1978 Law Forum 863, 867. Also, the new section picked up an additional ground for disqualification "where (a) he has a personal bias or prejudice concerning a party, or has personal knowledge of disputed evidentiary facts concerning the proceeding . . . ."

During 1973 the House Committee on the Judiciary followed the lead of the ABA and took steps to correct the ambiguities in the statutory scheme which they felt put the judges on the "horns of a dilemma," and tended to weaken confidence in the judicial system. H.R.Rep.No.93–1453, 93rd Cong., 2d Sess. 2, *reprinted in* [1974] U.S.Code Cong. & Ad.News 6351, 6352. Senator Quentin N. Burdick of North Dakota introduced a bill with the cosponsorship of Senators Ernest F. Hollings of South Carolina, and Birch E. Bayh of Indiana to amend section 455 and incorporate the ABA canon.[14] The new code provision was passed in 1974 and provided in pertinent part:[15]

§ 455. Disqualification of justice, judge, magistrate, or referee in bankruptcy

**13.** (2) A judge should inform himself about his personal and fiduciary financial interests, and make a reasonable effort to inform himself about the personal financial interests of his spouse and minor children residing in his household.

(3) For the purposes of this section:
(a) the degree of relationship is calculated according to the civil law system;
(b) "fiduciary" includes such relationships as executor, administrator, trustee, and guardian;
(c) "financial interest" means ownership of a legal or equitable interest, however small, or a relationship as director, advisor, or other active participant in the affairs of a party, except that:
(i) ownership in a mutual or common investment fund that holds securities is not a "financial interest" in such securities unless the judge participates in the management of the fund;
(ii) an office in an educational, religious, charitable, fraternal, or civil organization is

not a "financial interest" in securities held by the organization;
(iii) the proprietary interest of a policy holder in a mutual insurance company, of a depositor in a mutual savings association, or a similar proprietary interest, is a "financial interest" in the organization only if the outcome of the proceeding could substantially affect the value of the interest;
(iv) ownership of government securities is a "financial interest" in the issuer only if the outcome of the proceeding could substantially affect the value of the securities.

**14.** The relationship between the ABA Canon 3 C and the Congressional effort to amend section 455 is illustrated by the fact that the bill introduced by Senator Hollings to amend section 455 was patterned after an earlier draft of the proposed ABA Canon. S.1553, 92d Cong. 1st Sess. (1971).

**15.** Title 28 U.S.C. § 455 was amended in 1978 to strike all references to referees in bankruptcy. Pub.L.95–598 effective October 1, 1979.

(a) Any justice, judge, magistrate, or referee in bankruptcy of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

(b) He shall also disqualify himself in the following circumstances:

(1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;

(2) Where .in private practice he served as lawyer in the matter in controversy, or a lawyer with whom he previously practiced law served during such association as a lawyer concerning the matter, or the judge or such lawyer has been a material witness concerning it;

(3) Where he has served in governmental employment and in such capacity participated as counsel, adviser or material witness concerning the proceeding or expressed an opinion concerning the merits of the particular case in controversy;

(4) He knows that he, individually or as a fiduciary, or his spouse or minor child residing in his household, has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding;

(5) He or his spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person:

(i) Is a party to the proceeding, or an officer, director or trustee of a party;

(ii) Is acting as a lawyer in the proceeding;

(iii) Is known by the judge to have an interest that could be substantially affected by the outcome of the proceeding;

(iv) Is to the judge's knowledge likely to be a material witness in the proceeding . . . . . [16]

Act of Dec. 5, 1974, Pub.L.No.93–512, § 1, 88 Stat. 1609 (codified at 28 U.S.C. § 455 (1976)).

It is evident in comparing Canon 3 C and section 455 that certain changes were made and words added in the final version of the enacted statute. These modifications apparently were viewed by the legislators as merely "technical." [17]

---

**16.** The remaining provisions in § 455 are as follows:

(c) A judge should inform himself about his personal and fiduciary financial interests, and make a reasonable effort to inform himself about the personal financial interests of his spouse and minor children residing in his household.

(d) For the purposes of this section the following words or phrases shall have the meaning indicated:

(1) "proceeding" includes pretrial, trial, appellate review, or other stages of litigation;

(2) the degree of relationship is calculated according to the civil law system;

(3) "fiduciary" includes such relationships as executor, administrator, trustee, and guardian;

(4) "financial interest" means ownership of a legal or equitable interest, however small, or a relationship as director, adviser, or other active participant in the affairs of a party, except that:

(i) Ownership in a mutual or common investment fund that holds securities is not a "financial interest" in such securities unless the judge participates in the management of the fund;

(ii) An office in an educational, religious, charitable, fraternal, or civil organization is not a "financial interest" in securities held by the organization;

(iii) The proprietary interest of a policyholder in a mutual insurance company, of a depositor in a mutual savings association, or a similar proprietary interest, is a "financial interest" in the organization only if the outcome of the proceeding could substantially affect the value of the interest;

(iv) Ownership of government securities is a "financial interest" in the issuer only if the outcome of the proceeding could substantially affect the value of the securities.

(e) No justice, judge, magistrate, or referee in bankruptcy shall accept from the parties to the proceeding a waiver of any ground for disqualification enumerated in subsection (b). Where the ground for disqualification arises only under subsection (a), waiver may be accepted provided it is preceded by a full disclosure on the record of the basis for disqualification.

**17.** "The similarity of § 455 to Canon 3 C also extends to subsection (a) of § 455. Both Canon 3 C(1) and § 455(a) provide for a judge's dis-

■ From its inception the 1974 version of section 455 had no particular procedural requirements included with it as are found in section 144. And it was clear that section 455 was not to be peremptory. This is evident by the fact that between 1970 and 1973 Senator Bayh twice proposed amendments to section 144 which would have provided parties with a clear peremptory challenge to a judge assigned to a case.[18] These proposals were refused by Congress and the only action taken dealt solely with section 455.[19] Courts and commentators have all agreed that the 1974 version of section 455 is self-enforcing and does not require any action by the parties. *See, Davis v. Board of School Commissioners of Mobile County*, 517 F.2d 1044, 1051 (5th Cir. 1975); Wright, Miller & Cooper, *Federal Practice & Procedure*, § 3550. Thus the procedural requirements, or the lack thereof, are carried over from the prior section.

■ One of the most important parts of the new section 455 was the opening subsection (a). This subsection was denoted as a catch-all provision to supplement the grounds for disqualification under subsection (b). This general standard provides for self-disqualification in a proceeding in which a judge's "impartiality might reasonably be questioned," thus adopting the objective standard advocated by the ABA canon. This new objective standard has been at various times referred to as "the reasonable man," "a reasonable appearance," or "the reasonable factual basis" test. *See Parrish v. Board of Comm'rs of Alabama State Bar*, 524 F.2d 98, 103 (5th Cir. 1975) (*en banc*), *cert. denied*, 425 U.S. 944, 96 S.Ct. 1685, 48 L.Ed.2d 188 (1976). The Fifth Circuit in *Parrish* articulated the test as one where a claim under subsection 455(a) is "supported by facts which would raise a reasonable inference of a lack of impartiality on the part of the judge in the context of the issues presented in a particular law suit." *Parrish, supra*, at 103–04. The Reporter for the ABA Committee that drafted the Code of Judicial Conduct (from which the standard of subsection 455(a) is taken verbatim) explained the standard as follows:

> Any conduct that would lead a reasonable man *knowing all the circumstances* to the conclusion that the judge's "impartiality might reasonably be questioned" is a basis for the judge's disqualification.

qualification in any proceeding 'in which his impartiality might reasonably be questioned.' In Canon 3 C(1)(a) this language explicitly includes, but is not limited to, cases of personal bias and prejudice. It is less clear that the language of § 455(b)(1) was intended to be subsumed in § 455(a), for subsection (b)(1) is prefaced by the phrase '[a judge] shall *also* disqualify himself in the following circumstances: . . .' (emphasis added). But the addition of this phrase is described in the legislative history as 'a technical change,' and § 455(a) is characterized as a 'general, or catch-all, provision.' H.R.Rep.No.93–1453, 93d Cong., 2d Sess., reprinted in [1974] U.S.Code Cong. & Admin. News, pp. 6351, 6354." *United States v. Olander*, 584 F.2d 876, 882 (9th Cir. 1978).

18. Senator Bayh's proposal to amend § 144 provided in part:

> Whenever a party to any proceeding in a district court makes and files a timely affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding.

Frank, *Disqualification of Judges: In Support of the Bayh Bill*, 35 Law & Contemp.Prob. 43, 66 *quoting* the proposed Bayh revision of 28 U.S.C. § 144. The Bayh proposal differs from the existing statute only in that the proposal does not require the affidavit to be sufficient. Senator Bayh indicated that his proposal was intended to provide a peremptory-type challenge: "my bill's allegation of bias . . . is clearly pro forma." *Hearings on S.1064 Before the Subcomm. on Improvements in Judicial Machinery of the Senate Comm. on the Judiciary*, 93d Cong., 1st Sess. at 12–15 (1973) *quoted in* Note, *Caesar's Wife Revisited—Judicial Disqualification After the 1974 Amendments*, 34 Wash. & Lee L.Rev. 1201, 1217 n. 106 (1977).

19. Senator Bayh indicated when he introduced the amendment to section 455 that although he still favored a peremptory system, he would save that battle for another day. *Proposed Amendment to Broaden and Clarify the Grounds for Judicial Disqualification: Hearings on S.1064 Before the Subcomm. on Improvements in Judicial Machinery of the Senate Comm. on the Judiciary*, 93d Cong., 1st Sess. 6 (1971 & 1973).

Thode, Reporter's Notes to Code of Judicial Conduct (1973), 100. (emphasis added)

Therefore, while the standard under subsection 455(a) is an objective one, and the same section in no way pre-empts a judge from considering the basis of the motion to disqualify, it appears appropriate for the judge to evaluate all the facts [20] and circumstances surrounding the alleged appearance of impartiality and determine if a reasonable, uninvolved observer would question the judge's impartiality.[21] One commentator has pointed out with respect to the standard found in both the Code of Judicial Conduct and section 455:

> The test actually adopted in the Code ... seeks to guarantee not only that a biased judge will not participate but also that no reasonable person will suspect as much; the *appearance* [emphasis in original] of impartiality throughout the judiciary is the goal. The fact that the Code adopts the standard of a reasonable man knowing all the facts does not reduce this emphasis on appearance. Hidden facts indicating partiality may at any time come into public view and therefore are legitimate elements of an appearance test; *and hidden facts tending to rebut an inference of partiality are presumably in the judge's power to reveal once public suspicion of his partiality in a given instance has been aroused.* (citation omitted) (emphasis added)

Note, *Disqualification of Judges and Justices in the Federal Courts*, 86 Harv.L.Rev. 736, 745–46 (1973).

■ If a judge who is being asked to disqualify himself cannot make all relevant facts known, or rebut those facts that are false and which if left unrefuted would create a reasonable question of impartiality, the result would be an essentially pre-emptive proceeding where the judge would be "the *victim* of the appearance of impropriety ..." (emphasis added)[22] with no recourse to remove a possible taint on his integrity. Furthermore, allowing a judge the liberty to evaluate the truth, as well as the sufficiency of the alleged facts, is compatible with the Congressional attempt to control bad-faith litigants' manipulation of the disqualification procedure. This is evident because section 144 has attending procedural requirements to prevent abuse of the disqualification process; section 455 on the other hand permits the judge to edit the inaccurate allegations which could be the basis for disqualification under an appearance of partiality standard. *See*, 46 U.Chic. L.Rev., *supra* at 250.

■ The adoption of the "appearance of impartiality" test implemented in section 455(a), besides creating an objective standard, was also intended to relieve the conflicting duties imposed on judges of *sua sponte* disqualification, and the "duty to sit" in proper cases. The legislative history of the new section made it clear that the "duty to sit" rule had been done away with. By eliminating the "duty to sit" rule Congress hoped to "enhance public confidence in the impartiality of the judicial system." H.R.Rep.No.1453, 93d Cong., 2d Sess. 2, 5

---

**20.** *See United States v. Winston*, 613 F.2d 221, 222 (9th Cir. 1980) (and cited cases).

**21.** There has been some discussion among commentators as to the proper point of view from which to apply the proper legal standard. While the statute gives no indication of what perspective the question of the reasonableness of the allegations, the courts that have addressed the question have applied two different approaches. Both the First Circuit in *United States v. Cowden*, 545 F.2d 257 (1st Cir. 1976) and the Fifth Circuit in *Parrish* adopted the perspective of an uninvolved or disinterested observer. The dissent in *Parrish* urged that the legislative intent of Congress was to approach the reasonableness test from the point of view

of the litigant, i. e., whether the litigant's fear of bias has a reasonable basis. The Tenth Circuit in *United States v. Ritter*, 540 F.2d 459 (10th Cir. 1976), apparently adopted the latter approach.

The disinterested observer appears to this court to be the more persuasive approach considering that one of the major reasons for the proposed amendment is to increase public confidence in the judiciary. *See infra* p. 16.

**22.** J. C. Goulden, *The Benchwarmers*, 294 (1974) *quoted in*, Comment, *The Elusive Appearance of Propriety: Judicial Disqualification Under Section 455*, 25 DePaul L.Rev. 104, 126 (1975).

(1974), *reprinted in* [1974] U.S.Code Cong. & Ad.News at 6352, 6355. While most courts acknowledge the clear legislative intent of abolishing the "duty to sit" rule, *see, e. g., United States v. Wolfson,* 558 F.2d 59, 63 (2d Cir. 1977); *United States v. Haldeman,* 559 F.2d 31, 139 n. 360 (D.C.Cir.1976) (en banc) (per curiam) *cert. denied,* 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977); *Davis v. Board of School Comm'rs,* 517 F.2d 1044, 1052 (5th Cir.) *cert. denied,* 425 U.S. 944, 96 S.Ct. 1685, 48 L.Ed.2d 188 (1975); *Hawaii-Pacific Venture Capital Corp. v. Rothbard,* 437 F.Supp. 230, 234 (D.Hawaii 1977); *Smith v. Pepsico, Inc.,* 434 F.Supp. 524, 526 n.2 (S.D.Fla.1977); *Fong v. American Airlines, Inc.,* 431 F.Supp. 1334, 1337 (N.D.Cal.1977); *Bradley v. Milliken,* 426 F.Supp. 929, 933 (E.D.Mich.1977); *Samuel v. University of Pittsburgh,* 395 F.Supp. 1275, 1277 n.3 (W.D.Pa.1975), *vacated on other grounds,* 538 F.2d 991 (3d Cir. 1976), other courts have either overlooked the legislators' intent or have sought to articulate some limited version of that duty. *See, e. g., United States v. Bray,* 546 F.2d 851, 857 (10th Cir. 1976); *Smith v. Danyo,* 441 F.Supp. 171, 175 (M.D.Pa.1977); *Honneus v. United States,* 425 F.Supp. 164, 166 (D.Mass.1977); *United States v. Sinclair,* 424 F.Supp. 715, 719 (D.Del.1976); *Andrews, Mosburg, Davis, Elam, Legg & Bixler, Inc. v. General Ins. Co.,* 418 F.Supp. 304, 307 (W.D.Okl.1976); *Simonson v. General Motors Corp.,* 425 F.Supp. 574, 579 (E.D.Pa. 1976); *Duplan Corp. v. Deering Milliken, Inc.,* 400 F.Supp. 497, 526–27 (D.S.C.1975); *United States v. Pastor,* 419 F.Supp. 1318, 1332 (S.D.N.Y.1975); *Virginia State Bar Assoc. v. Hirschkop,* 406 F.Supp. 721, 725 (E.D.Va.1975); *Sperry Rand Corp. v. Pentronix, Inc.,* 403 F.Supp. 367, 373 (E.D.Pa. 1975); *Hall v. Burkett,* 391 F.Supp. 237, 240 (W.D.Okl.1975). One of the possible reasons for the hesitancy of some courts to strictly apply a "no duty to sit rule" is the legislators' own refusal to make section 455 a strictly peremptory challenge statute. For example, the Senate Judiciary Committee warned judges of applying section 455 too cavalierly.

> [I]n assessing the reasonableness of a challenge to his impartiality, each judge must be alert to avoid the possibility that those who would question his impartiality are, in fact, seeking to avoid the consequences of his expected adverse decision. Disqualification for lack of impartiality must have a *reasonable* basis. Nothing in this proposed legislation should be read to warrant the transformation of a litigant's fear that a judge may decide a question against him into a "reasonable fear" that the judge will not be impartial. Litigants ought not to have to face a judge where there is a reasonable question of impartiality, but they are not entitled to judges of their own choice.

S.Rep.No.93–419, 93d Cong., 1st Sess. 1973, p. 5 (emphasis in original).

Thus, while the legislative history of section 455 indicates Congress' intention to do away with the "duty to sit" rule, and for judges not to consider that duty and disqualify themselves in "close" cases they also show their concern that only in proper cases are judges disqualified and then only if the basis is reasonable.

 From a review of the legislative history of sections 144 and 455, it becomes clear that the two provisions, although dealing with judge disqualification, approach the matter in two separate and distinct ways. The semi-peremptory section 144 is initiated by a party affidavit, the contents of which must be taken as true, and a judge after determining its legal sufficiency must disqualify himself. This section is also accompanied by certain safeguards to preserve the integrity of the judicial system. The self-executing section 455 is to be instigated *sua sponte* by the judge when it is determined to be appropriate. A party does have a right to bring the question before the judge by way of a motion.[23] The judge is to take into consideration all the

---

**23.** *See, Davis v. Board of School Comm'rs, supra*; 13 Wright, Miller & Cooper, *supra,* § 3550.

circumstances both those in public and hidden view and determine if a reasonable, uninvolved observer would determine that the judge's partiality might be questioned. In making such an assessment, it is clear that the judge is not limited to those facts presented by the challenging party, *Matter of Searches Conducted on March 5, 1980,* 497 F.Supp. 1283, 1291 (E.D.Wis.1980), as he would be in a section 144 motion, nor must he accept the asserted facts as true. Finally, to read into section 455 the procedural requirements of section 144 would be to amend section 455 in such a way that Congress explicitly refused to do.

The second question that is yet unresolved deals with the proper standard under sections 144 and 455 with which to evaluate the sufficiency of the allegations of partiality. As mentioned before the two principal competing standards that have received prevalent recognition from the courts are the appearance-of-bias test, i. e., the allegations need only be sufficient to support a reasonable apprehension of bias, and the bias-in-fact test, i. e., the allegations must be sufficient to support a conclusion that bias actually exists.

Looking to the language of each of the sections does not necessarily provide a conclusive answer to the question of the applicable standard. Section 144 does not appear to favor or disfavor either approach yet almost universally the bias-in-fact standard has been applied. Section 455, on the other hand, indicates a preference for the appearance-of-bias test, yet all courts have not given it that interpretation.

After the re-enactment of section 455 in 1974 the Fifth Circuit approached the question of which standard was to be applied to each of the two disqualification sections in the case of *Parrish v. Board of Comm'rs, supra.* In *Parrish,* a suit alleging racial discrimination in the administration of the Alabama bar examination, the plaintiffs moved to remove the trial judge under section 144, alleging that because the trial judge had recently been president of a local county bar association which had excluded blacks from membership, he was thus bi-

ased or prejudicial. The judge refused to disqualify himself and the issue was reviewed on appeal. In an *en banc* review affirming the trial judge, the Fifth Circuit addressed the applicable standard under each of the two sections 144 and 455.

First, in addressing the appropriate standard under section 144, the dissenting judges looked to the recent legislative reconsideration of section 455 and urged that section 144 should be interpreted in light of those revisions and therefore apply an appearance-of-bias test. The dissenting judges argued that the appearance-of-bias test promulgated in section 455 should be uniformly applied to section 144 because the two sections are only technically separate statutes and should be considered a unified statutory scheme of disqualification. The majority in *Parrish,* however, refused to follow the dissents' reasoning, but opted instead to retain the established judicial gloss on section 144 and apply a bias-in-fact test. *Parrish v. Board of Comm'rs, supra,* at 101–02. In his concurring opinion, Judge Gee analyzed the effect of applying an appearance-of-bias test within the procedural strictures of section 144 as articulated in *Berger v. United States, supra.* He wrote that such a combination would make a judge's disqualification a "curious and hypothetical proceeding" where the judge must decide "whether an apprehension of bias is reasonably supported by whatever suppositious state of facts a daring and unscrupulous or perhaps merely misadvised and agitated party may be willing to swear to." *Parrish, supra* at 106.

In considering disqualification under section 455 the *Parrish* court followed its holding in *Davis v. Board of School Commissioners, supra,* wherein the court addressed the relative tests in sections 144 and 455. In *Davis* the court wrote:

> Construing §§ 144 and 455 *in pari materia* we believe that *the test is the same under both.* We thus hold that an appellate court, in passing on questions of disqualification of the type here presented, should determine the disqualification

on the basis of conduct which shows bias or prejudice or lack of impartiality by focusing on a party rather than counsel. The determination should also be made on the basis of conduct extra-judicial in nature as distinguished from conduct within a judicial context. *This means that we give §§ 144 and 455 the same meaning legally for these purposes, whether for purposes of bias and prejudice or when the impartiality of the judge might reasonably be questioned.* (emphasis added)

*Id.* at 1052.

In essence the Fifth Circuit chose to view section 144 and section 455 as a unified statutory approach, as had been suggested by the dissent in *Parrish*, but instead of applying the broader appearance-of-bias standard to section 144, they applied the stricter bias-in-fact standard to section 455.

The Fifth Circuit's reading together of sections 144 and 455 has not been well received by other courts. *See, United States v. Ritter*, 540 F.2d 459 (10th Cir.), *cert. denied*, 429 U.S. 951, 97 S.Ct. 370, 50 L.Ed.2d 319 (1976); *Rice v. McKenzie*, 581 F.2d 1114 (4th Cir. 1978); *United States v. Cowden*, 545 F.2d 257 (1st Cir. 1976), *cert. denied*, 430 U.S. 909, 97 S.Ct. 1181, 51 L.Ed.2d 585 (1977). The Ninth Circuit, however, has followed the Fifth Circuit's lead and found that a bias-in-fact standard governs all motions to disqualify under sections 144, 455(b)(1) and 455(a). In *United States v. Olander*, 584 F.2d 876 (9th Cir. 1978), the Ninth Circuit wrote:

The 1974 amendments to § 455, with minor changes, effectively enacted Canon 3 C of the American Bar Association Code of Judicial Conduct into law. When the ABA adopted the Code in 1972, it incorporated the language of 28 U.S.C. § 144 requiring recusal whenever a judge "has a personal bias or prejudice" against a party into Canon 3 C, "Disqualification," (1)(a), "personal bias or prejudice concerning a party." The 1974 amendments to § 455 simply repeated this lan-

guage. Accordingly, the decisions interpreting this language in § 144 are controlling in the interpretation of § 455(b)(1).

The similarity of § 455 to Canon 3 C also extends to subsection (a) of § 455. Both Canon 3 C(1) and § 455(a) provide for a judge's disqualification in any proceeding "in which his impartiality might reasonably be questioned." In Canon 3 C(1)(a) this language explicitly includes, but is not limited to, cases of personal bias and prejudice. It is less clear that the language of § 455(b)(1) was intended to be subsumed in § 455(a), for subsection (b)(1) is prefaced by the phrase "[a judge] shall *also* disqualify himself in the following circumstances: . . ." (emphasis added). But the addition of this phrase is described in the legislative history as "a technical change," and § 455(a) is characterized as a "general, or catch-all, provision." H.R.Rep.No.93–1453, 93d Cong., 2d Sess., *reprinted in* [1974] U.S.Code Cong. & Admin.News, pp. 6351, 6354. In view of this, and because subsection (b)(1) expressly deals with disqualification for bias or prejudice, *it would be incorrect as a matter of statutory construction to interpret § 455(a) as setting up a different test for disqualification for bias or prejudice from that in § 455(b)(1).* This is especially so because both the drafters of the Code and the Congress in adopting subsection (b)(1) were careful to follow the language of § 144. *See* Frank, Commentary on Disqualification of Judges— Canon 3 C, 1972, Utah L.Rev. 377, 380 (section 144 has "been construed so narrowly as to require the clearest sort of direct personal bias against a party. The new Canon gingerly enters this field [and] makes no waves").

We agree with the Fifth Circuit that there is "no suggestion in the legislative history" that by the 1974 amendment of § 455, the decisions interpreting the bias and prejudice language of § 144 "were being overruled or in anywise eroded," and with that court's conclusion that the

test for bias or prejudice is the same under both statutes.

*Id.* at 882 (citations omitted).

While the court's decision has received criticism,[24] it has been followed in two subsequent cases. For example, the Ninth Circuit wrote in *United States v. Sibla*, 624 F.2d 864 (9th Cir. 1980);

> Sibla urges this court to find separate grounds for recusal under section 455(a) independent of the provisions of sections 144 and 455(b)(1). However, we have ruled that section (b)(1) simply provides a specific example of a situation in which a judge's "impartiality might reasonably be questioned" pursuant to section 455(a). *Olander*, 584 F.2d at 882.... whether the district judge erred in refusing to recuse himself for personal bias or prejudice pursuant to section 144 or section 455(a) & (b)(1). The *same substantive standard will be applied to each section.*

*Id.* at 867 (emphasis added).

The court also wrote in *United States v. Conforte*, 624 F.2d 869 (1980):

> The statute imposes a self-enforcing duty on the judge, but its provisions may be asserted also by a party to the action.
>
> Recusal whenever a judge has a "personal bias or prejudice concerning a party" is required also by 28 U.S.C. § 144. We examined the relation between the two statutes in *United States v. Olander*, 584 F.2d 876 (9th Cir. 1978), and held that the decisions interpreting section 144 are also controlling in the interpretation of the bias and prejudice language in section 455(b)(1). A second point we made in *Olander* concerned the distinction between two subsections of section 455. We stated: "It would be incorrect as a matter of statutory construction to interpret section 455(a) as setting up a different test for disqualification for bias or prejudice from that in section 455(b)(1)."
> 624 F.2d at 880.
>
> We interpret this to mean that the *standard for determining the appearance or fact of the particular grounds for disqualification is the same,* but not that the reach of the two sections is in all cases coextensive. The standard for measuring the grounds of disqualification is similar, but the sections reach different factual contexts. *Olander* does not undercut the recognition that there may be cases within subsection (a) that are not within subsection (b); and we think this must be so or subsection (e), which allows waiver of disqualification under the former subsection but not the latter, would be without meaning. We need not examine for purposes of this case the comparative reach of the two sections, other than to suggest that subsection (a) is designed to cover contingencies not foreseen by the draftsmen, who set out specific grounds for disqualification under subsection (b). This interpretation is consistent with the legislative history, which describes subsection (a) as a "general, or catch-all, provision." H.Rep.No.1453, 93rd Cong., 2d Sess., *reprinted in* [1974] U.S.Code Cong. & Admin.News 6351, 6354. Subsection (a) was described as establishing an objective standard which required disqualification "if there is a reasonable factual basis for doubting the judge's impartiality." *Id.* at 6355. Subsection (b), on the other hand, was addressed to specific instances "which are in addition to the general standards set up in section (a)." *Id.* When these specific instances are present, the inquiry must proceed under subsection (b), rather than subsection (a), and waivers may not be accepted.

*Id.* at 880–81 (emphasis added) (citations omitted).

While these statements indicate that the Ninth Circuit intended the bias-in-fact standard of section 144 to apply to section 455(b)(1) and section 455(a), the court went on to explain the interrelation of the proper standard and the appropriate procedure as it applies to each section. In *Sibla* the court wrote:

> Although the substantive test for bias or prejudice is identical in sections 144 and 455, the procedural requirements of

---

**24.** *See*, 46 U.Chic.L.Rev., *supra* at 248.

the two sections are different. A brief discussion of those procedures is necessary for a full understanding of Sibla's rights on appeal in this case.

Section 144 expressly conditions relief upon the filing of a timely and legally sufficient affidavit. If the judge to whom a timely motion is directed determines that the accompanying affidavit specifically alleges facts stating grounds for recusal under section 144, the legal sufficiency of the affidavit has been established, and the motion must be referred to another judge for a determination of its merits.

Section 455, on the other hand, sets forth no procedural requirements. That section is directed to the judge, rather than the parties, and is self-enforcing on the part of the judge. Moreover, section 455 includes no provision for referral of the question of recusal to another judge; if the judge sitting on a case is aware of grounds for recusal under section 455, that judge has a duty to recuse himself or herself.

In light of the difference in procedures for sections 144 and 455, it is apparent that the two sections are not redundant but are complementary, even when the only ground for recusal alleged is bias or prejudice. A party desiring referral to a second judge upon a determination of legal sufficiency may invoke the provisions of section 144 by filing a motion under that section accompanied by a timely and sufficient affidavit. Such a motion should also prompt the judge to whom the motion is directed to determine independently whether all the circumstances call for recusal under the self-enforcing provisions of section 455(a) & (b)(1), a matter which rests within the sound discretion of the judge. Thus, section 455 modifies section 144 in requiring the judge to go beyond the section 144 affidavit and consider the merits of the motion pursuant to section 455(a) & (b)(1).

The net result is that a party submitting a proper motion and affidavit under section 144 can get two bites of the apple.

If, after considering all the circumstances, the judge declines to grant recusal pursuant to section 455(a) & (b)(1), the judge still must determine the legal sufficiency of the affidavit filed pursuant to section 144. If that affidavit is sufficient on its face, the motion must be referred to another judge for a determination of its merits under section 144.

The failure of a party to inform the judge of the party's belief that grounds for recusal exist will significantly affect the appellate standard of review of the judge's failure to recuse himself or herself. Of course, if the motion and affidavit required by section 144 is not presented to the judge, no relief under section 144 is available. On the other hand, failure to move for recusal at the trial level does not preclude raising on appeal the issue of recusal under section 455. Nonetheless, if no motion is made to the judge, or if a conclusory motion is made without reference to specific facts allegedly creating grounds for relief, a party will bear a greater burden on appeal in demonstrating that the judge committed reversible error in failing to grant recusal under section 455. In those circumstances, the reviewing court must determine whether the district court erred in failing *sua sponte* to recognize obvious grounds for recusal under section 455 and to grant recusal pursuant to that section.

*Id.* at 867–68 (citations omitted).

From the cases cited above it is evident that the Ninth Circuit's approach to disqualification under sections 144 and 455 for alleged bias or prejudice is to give the movant "two bites of the apple." First, the judge must apply section 455 and remove himself *sua sponte*, if appropriate; if not, then he must consider the sufficiency of the allegations made in the accompanying affidavit. If the allegations are sufficient, then the case must be reassigned. The court makes it clear that a bias-in-fact standard applies throughout the whole process. Also, it should be noted that if the motion and affidavit required by section 144 are not presented to the judge, then no relief is available under that section.

It must be pointed out that the majority of cases dealing with disqualification decided by the Ninth Circuit have been concerned with allegations of bias or prejudice. The motions to disqualify have usually been brought under sections 144, 455(b)(1) and 455(a). The court in *Conforte* indicated that sections 144, 455(b)(1) and 455(a) are not coextensive but that 455(a) can reach other contingencies not anticipated by the other sections. While it is well established what procedure and standard is applied when a motion is brought under 144, 455(b)(1) and 455(a), there is no clear indication of what standard and procedure is applicable to a motion to disqualify brought exclusively under section 455(a).

 From the matrix of standards and procedures possibly applicable to section 455(a), several combinations are foreclosed by that section's legislative history. All those approaches that would render the statute in effect peremptory are obviously precluded. For example, if an appearance-of-partiality standard is applied in conjunction with a procedure paralleling section 144, i. e., an affidavit whose contents must be taken as true would make disqualification mandatory upon the most flimsy of allegation. The potential for abuse is manifest and warned against by legal scholars.[25]

Two combinations of standards and procedures for a section 455(a) disqualification motion not only find support in legislative history but have found acceptance by court interpretations. They are first, section 455(a) could be treated exactly the same as section 144, that is, proceeding under 455(a) must be initiated by a verified affidavit along with a certificate of good faith; the affidavit would have to contain allegations of the actual fact of partiality, not merely the appearance thereof. A judge would review only the legal sufficiency of the

allegation and could not challenge the validity of the facts alleged. Some basis for the approach can be found in the Fifth and Ninth Circuits' consideration of the problem. For example, the Fifth Circuit stated in *Davis* that section 144 and section 455 should be construed *in pari materia* and conduct which shows bias or prejudice or lack of impartiality should apply the same standard. *See, supra*, page 1052. Also, the Ninth Circuit in *Olander, Sibla*, and *Conforte* could be read as requiring this procedure under a section 455(a) motion.

Second, section 455(a) can be seen as applying a liberal appearance-of-partiality standard and no particular procedural limitations. This approach, it must be pointed out, appears to be the closest to the general framework intended by Congress as discussed above. Under this approach a party could file a motion to disqualify stating those grounds and facts that support the proposition that a reasonable man could question the appearance of the judge's impartiality. In so doing the motion would call certain facts to the judge's attention. He would then be called upon to evaluate all the relevant facts relating to the question of an appearance of partiality. In so doing, a judge is under the obligation to go beyond the actual facts alleged and determine whether a reasonable, disinterested observer knowing all the facts would question the judge's appearance of impartiality.

 While theoretically section 455(a) can be interpreted in two different ways, its application in the instant case renders the same conclusion. Under the first approach to a section 455(a) motion to disqualify discussed above, it is important to consider what has been filed in its support. NOW's motion to disqualify is accompanied by a lengthy memorandum laying out the grounds for disqualification and supple-

---

**25.** One stated goal of those who advocate a peremptive system is to foster in the public greater confidence in the judiciary. The ability for a peremptive statute to attain this goal has been questioned. *See*, 34 Wash. & Lee L.Rev., *supra* at 1221, wherein the commentator wrote:

"Due process is threatened by delays resulting from the abuses that apparently accom-

pany such a procedure, and public confidence is likely to be further eroded by the use of this important due process safeguard as a mere instrument of trial strategy. Creating a procedural formality that facilitates judge-shopping and delay can only exacerbate the public's already dim view of the legal process." (footnotes omitted)

mented by a plethora of newspaper and magazine articles and several third-party affidavits. Clearly nothing has been filed that would qualify as an affidavit of factual contentions as required under the procedure of section 144, nor could it be considered its equivalent. Absolutely no indications have been made that Judge Callister has any actual bias or prejudice or that he is in fact partial. At best, the contents of the materials filed establish by innuendo that Judge Callister's impartiality might be questioned. Thus, if this Court were to apply the first interpretation of section 455(a), i. e., treating it essentially the same in standard and procedure as section 144, the defendant-intervenors' motion would have to be dismissed for failure to allege any facts legally sufficient to require disqualification.

If the alternative interpretation, i. e., the appearance of impartiality standard without the section 144 procedure, is applied, then it is appropriate for the Court to review all the facts surrounding the particular case and apply the appropriate standard. *See, Matter of Searches Conducted on March 5, 1980, supra.*

Before proceeding to review of the facts which are pertinent to the instant case, it would be appropriate to point out some areas of challenge where disqualification is clearly inappropriate.

■ The drafters of section 455 warned judges against litigants who would try to select a judge of their choice or avoid an expected ruling of a judge.[26] While an expected ruling could have a basis in a judge's personal animus, it could also be based in a judge holding a particular legal philosophy. Where a judge through his experience and legal training[27] developed a consistent legal philosophy, and the fact that such a philosophy demands that there be certain preconceptions regarding matters of legal principle, which could disadvantage one party, this legal conclusion should not be taken as demonstrating a disqualifying bias nor as an appearance of impartiality. 46 U.Chi.L.Rev., *supra* at 252.

■ In a related area, a distinction has been drawn in cases where a party is seeking to disqualify a judge based on what the judge is called on to do in the case. If a case is one which presents only a question of law, as compared to finding facts or applying law to facts, then disqualification is much less appropriate.[28] Two reasons seem to support this position. First, if the judge is acting as the finder of fact, the appellate court is restricted in its review of those factual findings. Fed.R.Civ.P. 52(a); see Wright & Miller, *supra*, § 2585. Second, a judge is limited by *stare decisis* to precedent established by higher courts in his interpretation of the controlling law of a case. Therefore, where it appears that a judge has a wide range of discretion, which could have an unreviewable effect, then grounds for disqualification should be strongly considered.

It should be noted that the case at bar is one challenging the constitutionality of Congressional resolution, House Joint Resolution 638,[29] which purported to extend the

---

26. *See, supra* pp. 722–723.

27. Justice Rehnquist wrote in *Laird v. Tatum*, 409 U.S. 824, 93 S.Ct. 7, 34 L.Ed.2d 50 (1972): "Since most Justices come to this bench no earlier than their middle years, it would be unusual if they had not by that time formulated at least some tentative notions which would influence them in their interpretation of the sweeping clauses of the Constitution and their interaction with one another. It would be not merely unusual, but extraordinary, if they had not at least given opinions as to constitutional issues in their previous legal careers. Proof that a Justice's mind at the time he joined the Court was a complete tabula rasa in the area of constitutional adjudication would be evidence of lack of qualification, not lack of bias." At 835, 93 S.Ct. at 13.

28. *See*, Note, *Disqualification of Judges and Justices in the Federal Courts*, 86 Harv.L.Rev. 736, 758–9.

29. House Joint Resolution 638 passed the House of Representatives of the United States on August 15, 1978, by a vote of 233 to 189. The Senate passed the Resolution on October 6, 1978, by a vote of 60 to 36. On the same day the Ninety-Fifth Congress of the United States passed, by a simple majority vote, the Resolution.

ratification period of the proposed Equal Rights Amendment an additional seven years. The State of Idaho also seeks to have its rescission of a prior ratification recognized, and its name removed from the list of ratifying states. A stipulation of all relevant facts was entered into by all parties and filed with the Court on January 19, 1981. Therefore, no factual inquiries are to be made by the Court and the only questions presented for the Court's consideration deal not with the content of the proposed Amendment, but instead deal with the procedural process of amending the Constitution.

Finally, another area which mandates careful review when asserted as a basis for disqualification is a judge's religious affiliation. Religious freedom is well recognized as one of the essential forces in the American Revolution, and is now jealously guarded by the Constitution. The first amendment prohibits congressional action respecting an establishment of religion, or prohibiting its free exercise. Furthermore, article VI, clause 3, of the Constitution provides that all governmental officers be bound by an oath to support the Constitution, but that "no religious Test shall ever be required as a Qualification to any Office or public Trust under the United States." This article VI religious test clause has received little, if any, attention from the courts, *Torcaso v. Watkins,* 367 U.S. 488, 81 S.Ct. 1680, 6 L.Ed.2d 982 (1961), mainly because the courts have noted an overlap between article VI and the first amendment establishment clause and have usually resolved questions which could arise under article VI under the first amendment. *See, e. g., Abington School District v. Schempp,* 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963).

From the Supreme Court's approach to article VI, clause 3, it is far from clear what its true scope is or whether it would directly limit the use of religious affiliation as a basis for disqualification. Nevertheless, it warrants noting that a judge's background associations, which would include his religious affiliations, should not be considered as grounds for disqualification. *Commonwealth of Pa. v. Local U. 542, Int. U. of Op. Eng,* 388 F.Supp. 155 (E.D.Pa.1974).

IV. *Relevant Factual Considerations:*

NOW's motion to disqualify asserts that the Court's appearance of impartiality might reasonably be questioned because of the following allegations:

1. The First Presidency of the Church of Jesus Christ of Latter-day Saints (the Church) has stated its position opposing the passage of the Equal Rights Amendment, and has encouraged members of the Church to work in appropriate arenas to defeat the ratification of the Amendment. *Defendant-Intervenors' Brief in Support of Motion for Disqualification,* p. 4–5.

2. The First Presidency has also opposed the extension of the ratification period as "unnecessary, unwise and unprecedented." *Id.* at 6.

3. The Church or its members have been active politically in various parts of the United States in opposing the ratification of the Amendment. *Id.* at 7.

4. In certain states, e. g., Virginia, Florida and Nevada, anti-ERA lobbying efforts were organized and supported by Church Regional Representatives who were purportedly asked by Church leaders to undertake these tasks. *Id.* at 7–9.

5. Judge Marion J. Callister is a member of the Church and at the time of filing of this case was serving as a Regional Representative. *Id.* at 15.

6. As a Regional Representative, it was Judge Callister's duty to assist the general leadership of the Church in the operation of Church programs in the region to which he was assigned. It is presumed that he faithfully carried out all of his duties including carrying forth the Church's opposition to the ERA. *Id.* at 16.

7. The Church considers its position on the ERA to be of the utmost importance and those who back the ERA are subject to sanctions, including excommunication, as is evidenced by proceedings taken against the

leader of the group "Mormons for ERA." *Id.* at 10, 18.

Furthermore, NOW contends that because its view of the circumstances, as creating a reasonable question of the Court's impartiality, is shared by numerous newspaper editorialists, and that this fact adds weight to the conclusion that the Court should disqualify himself.

█ As has been established in the first segment of this opinion, in a motion to disqualify based on section 455(a), it is the Court's responsibility [30] to consider all pertinent facts relating to the surrounding circumstances of the case, and after such a review determine if in the mind of a disinterested observer the Court's impartiality might reasonably be questioned. A review of pertinent facts is critical at this time not only to ascertain if disqualification is necessary, but also to establish an appropriate context in which to interpret the facts alleged by NOW in its memoranda, many of which are not altogether accurate [31] or relevant [32] to the issue at hand.

At the outset, two critical observations should be made. The first is that the Church of Jesus Christ of Latter-day Saints

---

**30.** Defendant-Intervenors argue that if any of the allegations found in their memoranda are refuted or contested, then they should be permitted discovery or an evidentiary hearing. *Defendant-Intervenors Memorandum in Reply to Opposition to the Motion to Disqualify*, p. 18. This request misconceives the nature of a motion to disqualify under section 455. As noted in this opinion a motion under section 455 is self-executing and the responsibility is placed on the judge to evaluate all the relevant facts in light of the proper standard. A motion to disqualify under section 455 is not based on the sufficiency of a party's pleadings or allegations, thus an evidentiary hearing or discovery is not required to establish disputed facts. If the Court feels that an evidentiary hearing would help him become aware of the truthfulness of facts that are not within knowledge, then one can be ordered for that purpose. Thus, an evidentiary hearing is within the discretion of the judge.

**31.** One allegation that is not accurately presented by NOW in their memoranda is that all members of the Church's clergy are under an obligation to obtain permission from Church leaders before accepting or running for political office. This is not the case. What was referenced by NOW as the "Political Manifesto of the General Authorities" applies only to those officers that serve in full-time positions. Local lay officers, such as a Regional Representative, do not need Church authorities' permission before accepting any line of work. The basis of this rule is that to accept any other work would interfere with full-time service in the Church. In this particular case the Court did not have to obtain Church authorities' permission before accepting his appointment to the federal bench, nor has he ever had to obtain such permission before entering into a field of work.

**32.** Allegations of fact that have no bearing on the question of disqualification:

(1) The excommunication of the founder of the group "Mormons for ERA," has no bearing or relevance to the present disqualification motion. The Church court action taken against Ms. Sonia Johnson and her eventual excommunication were based on the following charges: (a) preaching false doctrine, (b) condemning Church leadership, and (c) hindering the Church's missionary efforts. *See* Affidavit of Sonia Johnson, p. 2. Ms. Johnson was not excommunicated because of her belief in the ERA nor because she has actively supported it. The fact that she "can only conclude that the true reason for my excommunication was my public support for the Equal Rights Amendment and public exposure of the Church's anti-ERA political activities, *Id.* at 2–3, has no bearing on the case, and because it is self-serving, it is of questionable credibility.

The Court would note, however, that no evidence has been presented, nor is the Court aware of anyone who has been excommunicated from the Church for supporting the ERA. In fact the opposite seems quite true. For example, attached to NOW's reply memorandum is an affidavit of a stake officer who apparently strongly supports the ERA. Not only has he not been excommunicated but it appears that he has not lost his office of trust in the Church. The Court will also note the fact that two Church members who hold prominent positions, Idaho Governor John V. Evans, and Utah Governor Scott Matheson, have both publicly endorsed and supported the Equal Rights Amendment; and that by invitation, the Church's President, Spencer W. Kimball, attended Governor Evans' inauguration ceremony.

(2) Some appearance of impropriety was apparently intended by NOW's noting that one of the Court's law clerks, Cory Maxwell, is the son of a member of the Church's Special Affairs Committee which is purportedly responsible for anti-ERA political activities. To clarify the matter and expunge any innuendo, Cory Maxwell was actually hired as a law clerk a year before the present case was filed.

is not directly nor indirectly involved in the pending litigation as a party or as an *amicus curiae*, nor has the Church ever attempted to promote its position on the ERA by litigation.[33] It should also be recognized that the only relationship the Church has with this case is tangential at best, i. e., the Church has taken a moral stand against the possible impact of the broad and ambiguous wording of the Equal Rights Amendment. While the Church has been opposed to the propriety of the extension of the ratification period, it had never attempted to take an authoritative, legal position concerning the issues involved in this case, i. e., the proper procedure for amendment of the Constitution of the United States.

■ The second, and probably the most important observation, is that NOW, in its final reply memorandum, clarified its position that the disqualification they seek is not based solely on the Court's membership in the Church. They concede that disqualification based only on membership would be highly improper. *Defendant-Intervenors' Memorandum in Reply to Opposition to the Motion to Disqualify*, p. 21. In bringing a motion to disqualify, NOW focuses instead on the particular position once held by the Court as creating a reasonable question as to impartiality. While it is a matter of record that the Court no longer holds the position of Regional Representative, NOW contends that because that position was held by the Court at the time of the filing of the case, and for six months thereafter, it created an incurable taint. Therefore, the focal point of this inquiry should be whether there is anything particular about the holding of the position of a Regional Representative in the Church that would require disqualification under the standard

outlined. Questions which focus on religious beliefs or membership affiliation are presumed not to be relevant.

We turn now to a consideration of an office in the Church and in particular the office of Regional Representative. The officers of the Church of Jesus Christ of Latter-day Saints consists almost exclusively of a lay clergy, including the Regional Representatives, who serve without financial remuneration or compensation. There are a few exceptions, however, relating to those General Authorities of the Church who serve full time, and usually have general or Church-wide jurisdiction as opposed to local authorities who have such local jurisdiction as their callings provide. The Church recognizes the particular time constraints placed on a lay clergy and indicates that an officer's priorities should be to first provide financial support for their families, then spend what time is necessary to meet the emotional, spiritual and interpersonal needs of the family, and then give such time as is reasonable to Church service. When members are called to serve, there is no designation as to the duration of time that the call will last, and when a release is made, it is understood that the release does not reflect a malfeasance or nonfeasance of that office, but allows another the opportunity to serve. Furthermore, offices in the Church are seen as opportunities to serve and undertaken without compulsion.

The position of a Regional Representative is somewhat of an anomaly. While occasionally referred to as a General Authority, it is in fact a local calling with limited jurisdiction. A brief job description would include the following:[34] His most impor-

---

**33.** NOW raises the point that under the Code of Judicial Conduct of the American Bar Association a judge should refrain from serving as an officer in any organization whose interest might come before the Court, e. g., Anti-Defamation League of B'nia Brith, Sierra Club, and NAACP, since these organizations frequently appeal to the courts in furtherance of their stated goals. First, it should be pointed out that these organizations are all single-issue organizations and not churches. Second, it cannot be claimed that the Church uses the courts as a means of furthering its goals. Finally, it is incredible to believe that NOW would seriously maintain that the Code of Judicial Conduct should be read as requiring judges not to participate as active members or officers in their respective churches.

**34.** *See* Exhibit B of *Defendant-Intervenors' Memorandum of Points and Authorities in Support of Motion for Disqualification.*

tant duty is training stake presidencies [35] in leadership skills and church priesthood programs.[36] They also consult with stake presidencies in setting appropriate goals and evaluating their progress. Other duties include: coordinating multi-stake activities; [37] reviewing proposed stake and ward boundaries and submitting recommendations to area supervisors. Besides those duties outlined above, he has the responsibility of reporting performance and progress of stakes. The Regional Representative duties and responsibilities, however, relate only to the region to which he is assigned, and then has only limited jurisdiction even within his region. Furthermore, a Regional Representative is considered to have only limited line authority. For example, a Regional Representative does not serve as an intermediary between stake presidents and the general Church leadership. The Regional Representative is not involved in specific matters concerning Church courts and related activities, nor in counseling members in personal matters. These are handled by local leaders such as stake presidents, or bishops, and then if needed are referred by those leaders to the area supervisor, thus bypassing the Regional Representative. Also, a Regional Representative is not to call or release any local leaders; again, that is handled by area and General Authorities. A Regional Representative has no responsibility or control over local property held by the stakes or local units; those responsibilities lie exclusively with local leaders. Finally, all information coming down from the General Authorities is not necessarily passed through the Regional Representative,[38] thus they are not considered an informational conduit for the general leadership.

NOW, in its memoranda, argues that holding the position of Regional Representative creates an appearance that those who hold that position are responsible for Church policy in that area and are required to promote the Church's stand on the ERA.[39] In support of this contention they point to the activities of three Regional Representatives in Virginia, Nevada, and Florida who have been active in anti-ERA lobbying efforts. NOW alleges that their activities are at the request of Church leaders. NOW also indicates that certain political activities occurred in Idaho which brought about the rescission of Idaho's prior

**35.** The local Church structure is generally as follows: The smallest units of the Church are Branches and Wards which consist of about two to five hundred members and presided over by a Branch president or bishop and their counselors. A stake consists of five to 10 wards or branches and is presided over by a stake president and two counselors.

**36.** The essential priesthood programs consist of the following:

(1) Church Welfare—A project to assist members who are in need of aid whether physical, emotional or mental. The most prevalent aspect is the coordination of stake-owned farms and canneries where members donate labor to produce usable food items for those who need assistance.

(2) Genealogy—A program for searching out one's ancestors and performing Church ordinances in their behalf.

(3) Home Teaching—A program where priesthood leaders visit ward members once a month to assist the members in the study of the Gospel.

(4) Missionary Work—A program wherein those that have an interest in learning more about the Church and its teachings may do so through full-time and part-time missionaries.

All missionaries, whether full or part-time work at their own expense.

**37.** Multi-Stake activities include regional athletic events, e. g., basketball, volleyball, softball, tennis and golf, regional dances and socials, and all other stake activities which would go beyond normal stake boundaries, e. g., the most prevalent activity would be coordinating regional welfare projects.

**38.** A case in point is the letter from the First Presidency regarding their stand on the ERA. The letter (see exhibit D in NOW's *Memorandum of Points and Authorities in Support of Motion for Disqualification*) is addressed to local leaders, in particular, Stake presidents, bishops and Branch presidents, with direction for them to read it to the membership they preside over.

**39.** NOW has made the allegation that a Regional Representative is functionally the equivalent of a Catholic Archbishop. While the Court has no direct knowledge of what an Archbishop does, it is evident from the affidavit provided by Andrew J. Schumacher, the pastor of St. John's Cathedral in Boise, Idaho, that the two positions are not the same nor even analogous.

ratification of the ERA, and that the Church was somehow related to the activities. Whether these assertions are true or not is not within the knowledge of the Court and thus will be presumed to be true. But, it must be pointed out that organizing political lobbying efforts is not part of the responsibilities of a Regional Representative, and thus if such activity were undertaken he would most likely be acting in his capacity as a citizen and not in his Church capacity. This is doubly true considering he has no direct control or dominion over the general membership. In the Church there are well over 250 Regional Representatives. To conclude that because three Regional Representatives were involved in lobbying against the ERA that this taints all others who hold the same position is not a reasonable conclusion. Furthermore, NOW's allusion to the political activities in Idaho near the time of the move to rescind the prior ratification has no bearing on this case because the Court did not accept his assignment as a Regional Representative until after the Idaho legislature had acted and the matter was essentially a dead issue. In addition, the Court did not participate in such activities either before or after his calling as a Regional Representative.

The Court made clear in its prior ruling on the question of disqualification, that the Court has never publicly, either in a secular or ecclesiastical setting, stated any opinion or made his feelings known regarding the Equal Rights Amendment; nor has the Court, in any way, inserted himself improperly in the political process. The calling of Regional Representative is one of limited jurisdiction and circumscribed responsibility. At no time during the time that the Court served as a Regional Representative was he ever required or requested to promote the Church's position on the ERA. While the Court attempted to faithfully carry out his duties as a Regional Representative, those duties did not relate to the ERA.

NOW has made it clear through their memoranda that they feel that the Court's appearance, of impartiality can be questioned, and that under due process they have a right to an impartial forum. NOW also indicates that other judges have disqualified themselves in less compelling situations. While it is true that due process guarantees a party the right to an impartial forum, this should not be read as giving a party the judge of their choice. The standard in determining whether a particular judge is impartial or that his appearance of impartiality cannot be questioned is clear, and it is equally clear that it is not applied from the point of view of the parties, thus making the fears of the parties irrelevant. Only when a disinterested observer, knowing all the facts, would determine that a judge's appearance of partiality could reasonably be questioned, should a judge disqualify himself under section 455(a). The fact that other judges have been more liberal in their application of section 455(a) has no bearing on the case. In fact, a broad or liberal application of section 455(a) appears to be against the spirit of section 455. For example, if a judge disqualifies himself upon mere application, or mere allegation that his appearance of impartiality might be questioned, it would make the nonperemptive statute in effect peremptive and encourage judge-shopping which is clearly against the mandate of the statute's legislative history.

The circumstances of this case do not permit a reasonable disinterested observer, knowing all the facts, to decide that the Court's appearance of impartiality might reasonably be questioned. To grant NOW's motion under these circumstances would be an inappropriate application of section 455(a). Therefore, regardless of the two approaches to section 455(a) suggested by this opinion, both would compel a denial of NOW's motion.